Arthur Lee JONES, Petitioner,

v.

Fred SMITH, Commissioner, Alabama Department of Corrections and J.D. White, Warden, Holman Unit, Respondents.

Civ. A. No. 84–1421–H.

United States District Court, S.D. Alabama, S.D.

Dec. 13, 1984.

John Furman, Mobile, Ala., for petitioner.

Ed Carnes, Asst. Atty. Gen., State of Ala., Montgomery, Ala., for respondents.

## ORDER

HAND, Chief Judge.

This death penalty case is before the Court on Arthur Jones' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was indicted for the murder of Hosea Waymon, and subsequently found guilty and sentenced to death by an Alabama State Court. For reasons stated below this Court concludes that the petitioner is not entitled to habeas relief, that his petition is due to be dismissed with prejudice, and that his motion for a stay of execution is due to be denied. The Court will, however, enter a temporary stay in order to allow the petitioner time to present his claims to the Court of Appeals.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based upon the testimony at the hearing, arguments of counsel, and the record as a whole, the Court enters the following findings of fact and conclusions of law:

## ONE—JURISDICTION

Petitioner Arthur Jones was indicted by a Mobile, Alabama Grand Jury in May, 1982 on two counts of capital murder. He was accused of the intentional killing of Hosea Waymon, a Mobile cab driver. Count One charged a violation of *Code of Alabama,* 1975, § 13A–5–40(a)(2) (murder by the defendant during a robbery in the first degree). Count Two charged a violation of *Code of Alabama,* 1975, § 13A–5–40(a)(6) (murder committed while the de-fendant was under sentence of life imprisonment.) (Exh. A at 1)[1] Trial by jury was held on November 15–16, 1982. Petitioner was convicted on both counts on Tuesday, November 16, 1982. (Exh. A at 14) That same day, following a sentencing hearing, the jury recommended that petitioner be sentenced to death by electrocution. (Exh. A at 15) On November 23, 1982, the trial court filed a written order in which it weighed various aggravating and mitigating circumstances, and determined that the defendant should be sentenced to death. (Exh. A at 32–37)

Jones' conviction was affirmed on appeal by the Alabama Court of Criminal Appeals. 450 So.2d 165 (Ala.Crim.App.1983), *reh. den.* The Alabama Supreme Court granted *certiorari,* but affirmed the Court of Criminal appeals decision. 450 So.2d 171 (Ala. 1984). On October 1, 1984, the United States Supreme Court denied Jones' petition for a *writ of certiorari.* Following this denial, the Alabama Supreme Court on November 5, 1984, set petitioner's date of execution for December 14, 1984, any time after 12:01 A.M.

Petitioner then filed a petition for a writ of *error coram nobis* in the Circuit Court for Mobile County, Alabama. Following an evidentiary hearing held on December 10, 1984, the Circuit Court (per J. Kittrell, who presided at Jones' original trial) on December 11, 1984, entered lengthy and detailed findings of fact and conclusions of law denying the petition. Later that day, the petitioner filed a notice of appeal from Judge Kittrell's order with the Alabama Court of Criminal Appeals and, at the same time, applied for a stay of execution to the Alabama Supreme Court. That afternoon, following oral argument, the Alabama Supreme Court refused to stay the execution.

This petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 was filed this morning, December 13, 1984, along with a motion for leave to proceed *in forma pauperis,* and a motion for a stay of execution. The *habeas* petition included several claims

---

1. The citations to the various exhibits are based upon the State's Answer at 9–10.

raised in the State *coram nobis* proceeding which had not previously been raised at trial or on direct appeal. Thus, the petition is mixed, including both exhausted and unexhausted claims. See *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379.

■ At the outset the State informed the Court that the petitioner would not receive any relief from the Alabama State Courts, that any attempts for collateral relief at this point would be futile, and that the State waived any exhaustion requirements, and desired to proceed. The State also waived any exhaustion defenses in its answer. Petitioner concurred in the waiver. Based upon these representations, as well as considering the State's interest in the finality of these proceedings, the Court agreed to accept the waiver. See generally, *Thompson v. Wainwright*, 714 F.2d 1495 (11th Cir.1983).

Accordingly, this Court concludes it has jurisdiction over this cause.

### TWO—HABEAS PROCEEDINGS

On or about December 7, 1984, this Court was telephonically contacted by Ed Carnes of the Alabama Attorney General's Office and informed of the possibility that an emergency petition for federal *habeas* relief might be filed on the following week by Arthur Jones, who was scheduled to be executed on December 14, 1984. Mr. Carnes informed the Court he would be filing materials relevant to the case early during the week of December 10, 1984. On December 10, 1984, the Court received the following documents from the Attorney General: a trial transcript of *State of Alabama v. Arthur Jones*, case no. CC82–2983, Circuit Court of Mobile County, Alabama; various briefs; a Petition for a Writ of Certiorari to the United States Supreme Court; a Respondent's brief in opposition to the petition for *certiorari;* copies of Alabama appellate decisions pertaining to petitioner's case; an order of the U.S. Supreme Court denying *certiorari,* and a copy of the petitioner's petition for State *coram nobis* (collateral) relief. The Court

subsequently received a copy of the State Circuit Court's decision denying collateral relief, as well as a copy of the transcript of the evidentiary hearing on petitioner's request for collateral relief. Thus, prior to the *habeas* hearing, held earlier this morning, the Court had the opportunity to fully review the complete State Court record.

At the hearing the Court determined to accept the State's waiver of any unexhausted claims, which waiver was concurred in by the petitioner's attorney. The Court further inquired into the claims of the petitioner and was informed that the issues upon which the petitioner requested a hearing were claims One, Two and Three. A review of the claims clearly indicated that claim one could be dismissed summarily under *Habeas Rule* 4. The Court determined no hearing was necessary on the second claim (ineffective assistance of counsel) due to the extensive historical factual findings made by Judge Braxton Kittrell in petitioner's State *coram nobis* proceedings. Finally, the Court concluded that there was no evidence, whatsoever, to establish petitioner was insane or otherwise mentally incompetent and, therefore, no hearing was necessary on that issue. Finally, petitioner's counsel stated he wished to take testimony from one Bobbie Vaughn, an alleged alibi witness. Both the State and petitioner's counsel informed the Court that Vaughn's testimony would be that he had seen the petitioner the night of the murder, but several hours before the crime was committed. On that basis, and also because the claim involving Vaughn was really a request for habeas relief in the form of a new trial based on newly discovered evidence, the Court concluded no constitutional claim was involved.

■ A district court "is required to grant an evidentiary hearing where the facts were not sufficiently developed in the state court. See *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)." *Raulerson v. Wainwright*, 732 F.2d 803, 812 (11th Cir.1984). Furthermore, the burden of "demonstrating facts sufficient to warrant an evidentiary hear-

ing" is with the habeas petitioner. *Raulerson, supra*, at 813. A district court is not to blindly accept "speculative and inc011crete claims 'as the basis upon which a hearing will be ordered,' or additional time be granted." *Id.* Because the petitioner failed to meet his burden establishing the necessity of additional fact finding, the court concluded that an evidentiary was unnecessary.

Finally, petitioner's counsel was asked if there were any other claims he wished to advance on behalf of his client. He replied that based upon a complete review of the record there were no other meritorious claims that ought to be presented. The Court thereafter ruled that any other claims have been waived. *Habeas Rule* 9(b).

### THREE—CLAIMS

■ I. *Electrocution as Violative of the Eighth Amendment.* The petitioner's first claim (Para. 1–5) is that the manner of imposition of death by electrocution as practiced by the State of Alabama constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution. There is no merit to that claim, and it is summarily dismissed. *In re Kemmler*, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519; *Ritter v. Smith*, 568 F.Supp. 1499, 1525–1526 (S.D.Ala.1983), aff'd, 726 F.2d 1505, 1519 (11th Cir.1984) (death by electrocution as imposed by the State of Alabama is not in violation of the Eighth Amendment.); *Sullivan v. Dugger*, 721 F.2d 719 (11th Cir.1983).

II. *Ineffective Assistance of Counsel.* In Claim Two (Para. 6–12) the petitioner alleges ineffective assistance of counsel during only the guilt phase of his trial. More specifically he claims that trial counsel were ineffective in failing to properly investigate the case, to call an expert on eye witness identification, to request that opening and closing statements of counsel be reported, to call certain alibi witnesses, and in failing to present an opening statement to the jury during the guilt phase of the trial.

### A. *Findings of Fact*

Based upon the record as a whole, and in particular petitioner's State *coram nobis* hearing, Judge Kittrell's Findings of Fact and Conclusions of Law entered following that hearing and the transcript of that hearing, the trial transcript, as well as oral argument at the *habeas* hearing the Court finds the following facts:

1. Following the evidentiary hearing on petitioner's State *coram nobis* petition, the Honorable Braxton Kittrell entered detailed written Findings of Fact and Conclusions of Law on petitioner's claims of ineffective assistance of counsel. After reviewing his Findings and the transcript of the hearing, the Court concludes, pursuant to 28 U.S.C. § 2254(d) and *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), that the following *historical* facts as found by Judge Kittrell are fully supported by the record, presumptively correct, and binding upon this Court: Those facts found by Judge Kittrell in Paragraph 1–22 of his order on the Petition for a Writ of Error Coram Nobis which are fully incorporated in this opinion and are found as Appendix I and attached hereto.

### B. *Conclusions of Law*

■ The Sixth Amendment right to counsel is the "right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, 1449, n. 14, 25 L.Ed.2d 763 (1970). The purpose of the effective assistance requirement is to insure a fair trial. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Thus, the "ultimate focus of inquiry" in evaluating ineffective assistance of counsel claims is on the fundamental fairness of the proceeding whose result is being challenged. *Id.*

■ In *Strickland v. Washington, supra*, the Supreme Court articulated the

**1298**

general standards for judging ineffective assistance of counsel claims. A defendant's claim that counsel's assistance was so defective as to require reversal of the conviction has two components. *Id.* at —, 104 S.Ct. at 2064. First, the defendant must show that counsel's performance was deficient ("performance" component). *Id.* The proper standard for evaluating attorney performance is the objective standard of "reasonably effective assistance." *Id.* A defense attorney's performance must be "within the range of competence demanded of attorney's in criminal cases." *McMann v. Richardson, supra,* 397 U.S. at 770, 771, 90 S.Ct. at 1448, 1449. The defendant must show that counsel's representation fell below the objective standard of reasonableness under prevailing professional norms. *Strickland v. Washington,* — U.S. —, 104 S.Ct. at 2065. In evaluating the reasonableness of an attorney's performance, the Court is to judge counsel's conduct on the basis of all of the circumstances of the particular case, viewed as of the time of counsel's conduct, with the recognition "that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* 104 S.Ct. at 2066.

■ Second, the defendant must show that the deficient performance of counsel prejudiced the defense ("prejudice" component). This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland v. Washington, supra,* at —, 104 S.Ct. at 2067. An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Id.* at —, 104 S.Ct. at 2068. The appropriate test of sufficient prejudice warranting reversal is that a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

In other words, the test is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. *Id.*

■ Whether effective assistance has been afforded is a mixed question of law and fact. *Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980); *Harris v. Oliver,* 645 F.2d 327, 330, n. 3 (5th Cir.1981) *cert. denied,* 454 U.S. 1109, 102 S.Ct. 687, 70 L.Ed.2d 650. Accordingly, "a state court's determination of constitutionally effective assistance is not entitled to a presumption of correctness under 28 U.S.C. § 2254(d)." *King v. Strickland,* 714 F.2d 1481, 1485 (11th Cir.1983). Nevertheless, any "historical or primary facts found by the state courts are entitled to a presumption of correctness in a 28 U.S.C. § 2254 proceeding in federal court." *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Mason v. Balcom,* 531 F.2d 717, 721–22 (5th Cir.1976).

■ As noted above, petitioner alleges seven ways in which trial counsel were guilty of ineffective assistance. The first claim deals with the fact that petitioner's attorney Reynolds Alonzo did not want to represent the petitioner, and even moved to withdraw, but was forced to stay on by the trial court. This is clearly refuted by Findings of Fact (3) and (4) of Judge Kittrell's Order of December 11, 1984 in which he denied petitioner's motion for collateral relief. (Exh. Q at 2–3) Judge Kittrell specifically found that although there were problems between the petitioner and his attorney, Mr. Alonzo, the State court determined that problems between petitioner and his attorney were not irreconcilable ones. Therefore, the State court judge appointed a second attorney, Mr. John W. Coleman, to represent petitioner Jones as co-counsel with Mr. Alonzo. As a direct result of the appointment of Mr. Coleman, there were no more problems between petitioner and his attorneys. Said findings are historical facts, fully supported by the record, and entitled to presumptive correct-

ness, and binding upon this Court. 28 U.S.C. § 2254(d). Accordingly, this Court concludes that the State court's action did not contribute to any ineffective assistance of counsel, rather, the actions of the State court were intelligent, effective, and led to smoother, and indeed good relationships between petitioner and his trial counsel.

Petitioner's next claim of ineffective assistance relates to the fact that his attorney "made no motion for funds for an investigator, even though petitioner was indigent, and Alabama law provides for obtaining such funds in this circumstance. Hence, no effective investigation was made to locate witnesses who might have helped petitioner to defend himself in this case." That claim is refuted by paragraphs (5) and (6) of Judge Kittrell's Order, *supra*. (Exh. Q at 2–3) Judge Kittrell specifically found that trial counsel thoroughly investigated the case, interviewed the State's primary witnesses, and attempted to find and/or interview all of the potential alibi witnesses named to them by the petitioner. Under these circumstances, the Court concludes that trial counsel were not ineffective in their investigation of this case.

Petitioner also charges ineffective assistance of counsel due to the fact that his attorneys decided to waive an opening statement during the guilt stage of the trial. Judge Kittrell in paragraph (11) of his Order specifically found that the decision to waive an opening statement was a "strategic one which was reasonable under the circumstances." He stated further:

Both attorneys concurred in that strategy because they did not want to pin themselves down to what the evidence might or might not show. That is not an unusual tactic of criminal defense attorneys, nor is it an unreasonable one, particularly in a case such as this one. In regards to petitioner's argument that the attorney should have used the opening statement to familiarize the jury with principles of law and the application of law to the facts in this case, that is not the proper function of an opening statement. Had the attorneys attempted to use the opening statement for that purpose, the Court would have sustained an objection to it. Nor was it unreasonable for the attorneys to forego the use of the opening statement to tell the jury about the alibi witnesses and warn the jury about the criminal record of those witnesses. As one of the attorneys noted at the hearing, that would foreclose the defense from not calling those alibi witnesses. It was a reasonable decision to leave open the possibility that such witnesses might not be called, depending upon how the case developed and what Petitioner's views on the subject were at the end of the prosecution's case.

(Exh. Q at 5).

Attorneys are not generally held to be constitutionally ineffective because of a tactical decision. *See United States v. Guerra*, 628 F.2d 410, 413 (5th Cir.1980), *cert. denied*, 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 369 (1981). In the instant case, and based upon Judge Kittrell's findings, this Court concludes that trial counsels' decision to waive opening argument was a well thought out tactical decision, based on a number of factors, and that said decision does not constitute ineffective assistance of counsel.

Defendant also claims that his trial attorneys were guilty of ineffective assistance of counsel because they "failed to request that the opening and closing statements of counsel be recorded."

Hence there was no way for appellate counsel to look for reversible error there. For the reasons stated in paragraph (11) of Judge Kittrell's Order, this Court concludes that there was no ineffective assistance of counsel because of the failure to request that opening and closing statements be recorded. Indeed, although not all the opening and closing statements are recorded, petitioner's counsel objected twice during the State's closing and rebuttal arguments. (Exh. A at 170–171)

Petitioner further alleges that a number of "alibi and potential alibi witnesses were either not discovered, never investigated,

not subpoenaed, or were subpoenaed and did not show up, with trial counsel refusing petitioner's request for them to ask for a continuance to locate these witnesses. These witnesses included: Bobby Vaughn, Beatrice Chestang, Bobbie Preston, Larry Shekar, Lois Ware, Johnny Clemons, [and] Johnny Lane."

█ Based upon paragraphs (6) and (7) of Judge Kittrell's Order, *supra*, (Exh. Q at 3–4) this Court concludes that petitioner's trial attorneys made every reasonable attempt to find said witnesses, or in the cases of Beatrice Chestang, Bobbie Preston and Larry Shekar, the petitioner failed to tell his attorneys about said potential witnesses. Accordingly, the Court finds no ineffective assistance of counsel based upon failure to produce certain witnesses at trial.

█ Finally, petitioner asserts that his trial counsel were derelict in their duties because they failed to call "as a witness a psychological expert who could have testified as to the notorious unreliability of eye witness testimony, and did not even move for funds for such an expert."

Allegations of ineffective assistance of counsel "concerning uncalled witnesses impose a heavy showing since the presentation of testimonial evidence is a matter of trial strategy." *United States v. Guerra*, 628 F.2d at 413. Counsel will not be deemed to be constitutionally deficient because of tactical decisions. *Id.* See also paragraph (21) of Judge Kittrell's Order. (Exh. Q at 8) This claim also seems to be foreclosed by *Rodriguez v. Wainwright*, 740 F.2d 884 (11th Cir.1984), wherein it was held that there is no constitutional right to have expert testimony concerning eye witness testimony admitted into evidence even if it is offered. *Id.* at 885.

For the reasons stated above, the Court concludes that the petitioner has failed to demonstrate by a preponderance of the evidence that his trial attorneys were guilty of any ineffective assistance of counsel, nor has he established the requisite prejudice component. When reviewing the trial transcript as a whole, and the findings of the *coram nobis* proceedings, it does not appear as though the actions of his trial counsel, either separately or in combination "so undermine the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington, supra.*

III. *The Present Insanity Claim.* Petitioner's third claim (Para. 13–18) alleges that petitioner is presently insane, thus to execute him at this time would violate the Eighth Amendment as applied to the states through the Fourteenth Amendment. The claim of insanity has already been considered by the state trial court in a *coram nobis* proceeding. Pursuant to 28 U.S.C. § 2254(d) a presumption of correctness attaches to a state court's finding of fact. There are eight very limited exceptions to this rule. The only contention raised by petitioner is that the factual determination by the state court is not fairly supported by the record. § 2254(d)(8).

Petitioner alleges that he suffers from paranoid psychosis, that the condition has been continuous since sentence was imposed, that letters to his attorney support this contention, and that the court-ordered evaluation on which the state court refused relief was too short to adequately determine petitioner's mental condition.

█ In the concluding paragraph of section 2254(d), it is stated that "unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous." In this case the evidence at the State hearing does fairly support the finding that petitioner is sane.

The examining psychologist, Harry McClaren, Ph.D., testified that the report prepared by the staff at Taylor Hardin Secure Medical Facility after thorough research was accurate and correct. Mr. McClaren is a thoroughly qualified expert

in his field, and no objection was made by petitioner to the state court's acceptance of Mr. McClaren as an expert. The report showed that petitioner was aware of his surroundings, of the charges for which he was convicted, that he was sentenced to death, and that he understood the proceedings against him. No contradictory expert testimony was offered.

The only objection made by petitioner to the use of the aforementioned report was that seven days was too short a time to prepare it. Mr. McClaren testified that this is plenty of time, that any delays that ordinarily occur, occur because of administrative problems with the number of patients, not because of the medical or clinical need for additional time. Petitioner points to a report of another individual that took three months to prepare. Mr. McClaren stated clearly that that was an unusual case involving a Viet Nam veteran with a history of mental disorder, totally different from petitioner. The report was thus trustworthy. There was ample evidence to support the trial court's finding that petitioner is sane. Even petitioner's own testimony at the *coram nobis* hearing demonstrated his awareness of the meaning of that proceeding and of his impending fate.

Petitioner has presented insufficient evidence to cause this Court to find the state court's determination to be erroneous. The only evidence is a letter to petitioner's counsel from petitioner, and the testimony of Mr. McClaren that he could not rule out intermittent paranoid psychosis in *any* human being. The letters from petitioner, far from showing insanity, demonstrate that he was well aware of his impending fate. In a letter dated June 30, 1984, petitioner thanks counsel for "working to save my life." The letters speak mainly of civil actions petitioner had filed against the police and state prosecutor. They allege that evidence against him was fabricated. This merely shows that petitioner knew he needed to do *something* to avoid the death penalty. He chose to attempt to invent various explanations for his convictions. This does not present *convincing* evidence that the state court determination was erroneous. The statement by Mr. McClaren does not contravene the state court's finding, which was put down in great detail by Circuit Judge Kittrell, that petitioner is *now* sane. Claim three is therefore DENIED.

IV. *Sufficiency of the Evidence.* Petitioner's fourth claim (Para. 19–31) is that the State presented insufficient evidence to sustain a conviction.

### A. Findings of Fact

1. Based upon a review of the trial transcript, the Court concludes that the following historical facts found by the Alabama Court of Criminal Appeals are, pursuant to 28 U.S.C. § 2254(d) and *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), fully supported by the record, presumptively correct, and binding upon this Court:

> The State's evidence reveals that during the early morning of August 17, 1981, Mr. Waymon picked up his last fare at 12:41. [An eye] witness testified that the defendant stated that he wanted to go to Plateau and got into Mr. Waymon's cab at Mike's Cab Stand. The defendant was on parole from a sentence of life imprisonment for a robbery conviction from Clarke County.
>
> The dispatcher tried to contact Waymon by radio even before he "went around the corner." She tried three or four additional times but never did receive any response although Waymon "always answered his radio."
>
> Mobile Police Officer Leroy Sieck found Waymon's body near his cab at 1:11 that morning, approximately 35 minutes after Waymon had left with the defendant. Waymon had died from four .22 caliber gunshots fired at close range. The body was found in Plateau, in North Mobile, approximately two and four-tenths miles from the cab stand. Only $35.00 was found in Waymon's shirt pocket although there was evidence that he usually carried a "roll of money" in his pants pocket and could have had as much as $254.81.

It was established that the defendant was residing in Plateau and that his residence was eight-tenths of a mile from the scene of the crime. Witnesses testified that the defendant owned a .22 caliber pistol.

During the month of August, the defendant was employed by Industrial Services and received $373 for that month. The defendant was employed by this company as a "four-fifty an hour laborer" from May 29, 1981 til September 17, 1981.

In August of 1981, the defendant was three months delinquent in his automobile payments. His account was at the "maximum delinquency" and was roughly in the amount of $420. On August 12, 1981, a field representative with General Motors Acceptance Corporation attempted to repossess the car but the defendant refused to release the car. The defendant stated that he "didn't have the money at the time but ... would try and borrow it and come out to G.M.A.C. and pay it ... the next day."

The State also showed that the defendant made the following expenditures: On August 18th, the day of the murder, the defendant made a $139 car payment; on September 2d, the defendant paid $32.74 for an automobile license tag, $297 on his G.M.A.C. account, and $40 as a deposit to Alabama Power Company. The defendant changed his address between August 17 [the day of the murder] and September 2d. On November 2d, his automobile was repossessed because the defendant "never did catch up in his back payments."

*Jones v. State*, 450 So.2d 165, 167 (Ala. Crim.App.1983).

2. The Alabama Supreme Court expressly adopted those fact findings, *Ex Parte Jones*, 450 So.2d 171, 172 (Ala.1984), and added its own fact finding that, "... there was sufficient evidence presented from which the jury could exclude every reasonable hypothesis except that of guilt."

3. In addition to the facts found by the Alabama Appellate Courts, there was also testimony by police officers indicating that on the front seat of Mr. Waylon's cab were shoe prints made from a shoe "smaller than a size 10." (Exh. A at 31; 35) And although there was no testimony as to the petitioner's shoe size, there was evidence that his height was five feet 3 inches. (Exh. A at 53) In addition, there was eyewitness testimony in which the petitioner was described as wearing a type of blue uniform. (Trial at 61) The petitioner's employer, Mr. Malone, testified that the petitioner wore blue jean laborer type clothes. (Exh. A at 128–129)

4. Other testimony established that the decedent was to pay $100.00 to Mike's Cab for the use of the cab franchise. (Exh. A at 142) Thus a jury could infer that the decedent may have had as much as $354.00 in cash on him at the time of his murder. When the decedent's body was found, there was no roll of money in his pants pocket. (Exh. A at 148)

5. Thus, a jury could infer from the evidence that the petitioner was in need of money, that the decedent had money, that the decedent's money was stolen from him, and that the petitioner suddenly had more money than he made at his own job.

### B. *Conclusions of Law*

The petitioner raised this same sufficiency argument in the Alabama Court of Criminal Appeals, which summarized the applicable law as follows:

Testing the sufficiency of the evidence by the principles of *Dolvin v. State*, 391 So.2d 133, (Ala.1979), and *Cumbo v. State*, 368 So.2d 871 (Ala.Cr.App.1978), *cert. denied*, 368 So.2d 877 (Ala.1979), we find that the evidence, although circumstantial, was sufficient to permit the jury to exclude every reasonable hypothesis except that of guilty beyond a reasonable doubt, and was sufficient to sustain the verdict of guilt.

. . . . .

Taking all the evidence and the manner in which the individual facts connect and mingle, *United States v. Hines*, 662 F.2d 362, 367 (5th Cir.1981), and viewing it in

the light most favorable to the prosecution, we find that the evidence excluded every reasonable hypothesis or explanation but that of guilt.

*Jones v. State,* 450 So.2d at 167.

The Alabama Supreme Court reached the same conclusion in the matter stating:

We have reviewed the evidence in this case, and find that there was sufficient evidence presented from which the jury could exclude every reasonable hypothesis except that of guilty. · (Petitioner claimed that he was not riding in the victim's cab at the time of the crime *and* that someone could have entered the cab after he exited. *Dolvin v. State,* 391 So.2d 133, 137 (Ala.1979); *Cumbo v. State,* 368 So.2d 871, 874 (Ala.Crim.App. 1978).

*Ex Parte Jones,* 450 So.2d at 172.

When reviewing a conviction for sufficiency of the evidence in the context of a habeas petition, the District Court is to determine whether, "after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential element of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 433 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Buffo v. Graddick,* 742 F.2d 592, 595 (11th Cir. 1984). As a threshold matter the District Court must determine the elements of the offense. *Buffo v. Graddick,* 742 F.2d at 595. Defendant was convicted of violating section 13A–5–40(a)(2). That section provides that whoever commits murder "during a robbery in the first degree" is guilty of a capital offense. Alabama law defines murder in section 13A–6–2(a)(1) as follows:

(a) A person commits the crime of murder if:

(1) With intent to cause the death of another person, he causes the death of that person or of another person ...

Robbery in the first degree is defined in section 13A–8–41(a)(1) and (2) in relevant part as follows:

(a) A person commits the crime of robbery in the first degree is he violates section 13A–8–43 and he:

(1) Is armed with a deadly weapon or dangerous instrument; or

(2) Causes serious physical injury to another.

Section 13A–8–43 states that a person commits "robbery in the third degree if in the course of committing a theft he:" either uses force or threatens to use force.

The petitioner was also convicted of violating section 13A–5–40(a)(6), which provides that whoever has committed murder "while ... under sentence of life imprisonment," has committed a capital offense. Thus, the State must prove the elements of murder as previously stated under section 13A–6–2(a)(1), and the additional element that the defendant was under sentence of life imprisonment.

■ A comparison of Alabama law and federal constitutional law indicates that Alabama law comports with federal constitutional standards. This Court concludes that the State's evidence was sufficient to prove the elements of the offenses charged in the indictment. That is, a rational finder of fact could have concluded from the evidence that the petitioner intentionally murdered the decedent while committing a robbery with a dangerous instrument. There was also evidence at trial establishing that the petitioner, although on parole, was under sentence of life imprisonment.

V. *Further Investigation Claim.* Petitioner's fifth claim (Para. 32–35) alleges that due to evidence brought out at the *coram nobis* hearing, he ought to be allowed to undertake further investigation in order to shore up his alibi. In particular he alleges that one Larry Shekar would testify he and petitioner were together at the time of the murder. Petitioner also alleges that two prostitutes, Bobbie Preston and Beatrice Chestang (or Chestine) were present at the same time, and could substantiate that petitioner and Shekar were together. There are no allegations of state suborned perjury.

■ There is no merit to this claim which is really a request for *habeas* relief in the form of a new trial based on newly

discovered evidence. To be entitled to *habeas* relief on the grounds of newly discovered evidence, the "evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." *Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963); *Smith v. Wainwright,* 741 F.2d 1248 (11th Cir.1984).

Petitioner's fifth claim bears on guilt and not on a constitutional violation. Under *Townsend v. Sain,* and *Smith v. Wainwright,* the claim is due to be DENIED. For the same reasons, there is no need for the Court to take the testimony of Bobby Vaughn. See discussion, *supra.*

 **VI.** *Jury Instruction Claim.* The petitioner's sixth claim (Para. 36–40) is that the trial court's refusal to give a requested jury charge, upon the affirmance by the Alabama Supreme Court, rose to the level of a constitutional violation. The requested charge was a so-called "Telfaire" charge, *United States v. Telfaire,* 469 F.2d 552 (1972), on the dangers of eyewitness identification. While Alabama state law allows such a charge, *Brooks v. State,* 380 So.2d 1012 (Ala.Crim.App.1980), it is not required when the eyewitness identification was positive and unequivocal, as in this case. *Jones v. State,* 450 So.2d 165 (Ala. Crim.App.1983); *Minnifield v. State,* 392 So.2d 1288 (Ala.Crim.App.1983). Federal law, while encouraging courts to remain aware of the dangers of mistaken eyewitness identification, *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), has not yet required an absolute instruction such as was requested herein. In particular, neither the Fifth nor Eleventh Circuits have ever mandated the giving of a "Telfaire" instruction. In this Circuit, if a jury charge "accurately reflects the law and facts, the [trial] judge is vested with broad discretion in formulating his charge." *United States v. Borders,* 693 F.2d 1318 (11th Cir.1982). In this case the trial judge accurately stated the law and facts in compliance with Alabama law.

*Jones v. State,* 450 So.2d 165 (Ala.Crim. App.1983), *aff'd,* 450 So.2d 171 (Ala.1984). Failure to give the requested instruction does not rise to the level of a constitutional violation. Even courts that are in favor of this instruction have not gone so far. *See e.g., United States v. Dodge,* 538 F.2d 770, 784 (8th Cir.1976). This Court sees no reason for so holding. Accordingly, petitioner's sixth claim is DENIED.

**VII.** *Tainting of In-Court Identification by Improper Lineup.* Petitioner's seventh claim (Para. 41–49) is that he was denied due process by the admission of an in-court identification tainted by an impermissibly suggestive out-of-court pre-trial identification.

### A. *Findings of Fact*

Based upon the trial transcript, and facts found by the Alabama Court of Criminal Appeals, *Jones v. States,* 450 So.2d at 169–170, the Court enters the following findings of fact as they relate to the issue of the lineup:

1. The pre-trial identification involved herein was a line up conducted within three weeks of the crime.

2. Although the petitioner was shorter than other participants in the lineup, the difference in height was not so dramatic as to be unnecessarily suggestive. The color photograph of the lineup reveals that the petitioner was placed on the middle of the lineup containing five men. Each of the five men was black, and each was of similar skin tones. The clothes were of different varieties. Each man was dressed in civilian clothes, not in prison garb or institutional clothing. The manner in which each man was dressed was different. That is, the petitioner's clothes were not sloppily arranged, while each of the other participants was neatly dressed. Each participant wore his hair differently. Petitioner, whose hair is very short, was thus not prejudiced by being placed among men all of whom wore "afros" or long hair. The petitioner was not noticeably older or younger than each other participant. The lineup simply reveals no factors that would cause an onlooker unacquainted with the

petitioner to immediately fasten upon him as the murder suspect. The ineluctable conclusion is that the witness, Mr. Banks, recognized the petitioner because he saw him at the victim's cab stand on the night of the murder.

3. The petitioner also contends, however, that the police made overt suggestions to Mr. Banks, in effect pointing out the petitioner as the suspect who should be identified. The trial record of Mr. Banks' testimony shows this is not so. When asked by the Court what the police said upon requesting him to view the lineup, Mr. Banks stated, "They told me they had a lineup. They wanted to know would I identify the man if I see him again? I said, yea. So they come got me. So when they put him up in front of me I knowed him." (Exh. A at 51) Later the trial judge asked Mr. Banks, "Did the police ever tell you that the man they thought did it was in the lineup?" Mr. Banks: "No." The Court: "You're sure of that?" Mr. Banks: "I'm sure." (Exh. A at 56) On direct examination, Mr. Banks testified that the police showed him photographs before the lineup, but that none of them were of the petitioner. (Exh. A at 58) There were thus no overt suggestions by the police that would have caused Mr. Banks to wrongly identify the petitioner.

4. The petitioner also claims that the lineup should be held suggestive because Mr. Banks paid no attention to the other lineup participants. (Exh. A at 52–53) It is clear from the record that Mr. Banks recognized the petitioner from their encounter the night of the murder, and that, having so recognized him, Mr. Banks saw no reason to look further. (Exh. A at 73–76) Moreover, the certainty with which Mr. Banks identified the petitioner shows that it was recognition of the petitioner and not by lineup circumstances that riveted Mr. Banks' attention to the petitioner. *Cf. Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (virtually spontaneous identification upon seeing defendant indicative of trustworthiness). The certainty of Mr. Banks' identification weighs against a finding of suggestiveness. Upon being asked why he picked petitioner out of the lineup, Mr. Banks stated: "I picked him out because I know what I was looking at. I saw him before the lineup." (Exh. A at 76) The Court thus finds that the lineup was not so suggestive as to violate due process.

5. Petitioner complains that Mr. Banks verified the composite drawing by a police artist as the man he saw, but changed his description of the lineup. Composites are only "rough" sketches. The composite is similar to the photograph of petitioner in the lineup in terms of facial structures and overall appearances. Any differences between the drawing and the view of petitioner at the lineup are not so significant as to raise an inference that Mr. Banks' in-court identification of petitioner was based solely on the lineup.

6. Petitioner likewise complains that conflicting descriptions by Mr. Banks creates an inference of a suggestive lineup. This contention is also without merit. The alleged variations in the testimony concerned height and facial hair. Mr. Banks' description at the time was that the man was five foot five or five foot six. Later at trial his description was that the man was about the same height as himself. In light of the fact that Mr. Banks was seated on the hood of a cab when he saw petitioner, the night of the murder, it cannot be said that there was a sufficient variance in the description to warrant an inference that the lineup was too suggestive. At trial Mr. Banks testified that he and the petitioner were "about as high as I am." (Exh. A at 60) Mr. Banks was five feet four inches tall, and the petitioner is five feet three inches tall. There was no remarkable variance in the height of the five individuals in the lineup.

7. Similarly, the composite drawing already referred to showed petitioner with a thin mustache that Mr. Banks referred to as "lip hair". The confusion or conflict in Mr. Banks' testimony concerning facial hair is more apparent than real. Mr. Banks stated that the man he saw did not

have a mustache "like me". (Exh. A at 61) It is obvious that Mr. Banks, a man of apparent little education, (Exh. A at 67) was trying to describe the man as best he could, and mentioned his lack of a mustache because of his (Banks') own pronounced mustache. Petitioner's counsel attempted to dwell on the subject on cross-examination but failed to shake Mr. Banks' recognition of petitioner. The way in which Mr. Banks went about describing the man does not give rise to an inference that the lineup was the source of the in-court identification.

Thus, from all the circumstances, the most that can be gathered on petitioner's behalf is that Mr. Banks could not describe the suspect's height to the precise inch, and that Mr. Banks' description of petitioner's face was not described in perfect English. As the lineup was arranged to allow the witness to identify a suspect by his knowledge of the man, and not to choose him for artificial reasons, it cannot be said that the minor discrepancies in Mr. Banks' testimony lead to a conclusion of unfair suggestiveness. The Court finds no violation of due process in the context of the lineup. No substantial likelihood of irreparable misidentification appears to have been created by the lineup.

■ 8. In the alternative, the Court finds that any suggestiveness in the lineup was insufficient as a matter of fact to taint the in-court identification. At trial Mr. Banks stated very firmly that he could recognize the petitioner even if no lineup had been held. (Exh. A at 54) Mr. Banks repeatedly identified petitioner at the trial, and stated that he picked him out of the lineup based on their prior meeting. The Court finds that the evidence is overwhelming that Mr. Banks' recognition was completely independent of the lineup, even if the lineup had been suggestive.

9. The above findings of fact, made independently by this Court, establish that the findings of fact made by the Alabama Court of Criminal Appeals at 450 So.2d at 169–170, are entitled to a presumption of correctness and are binding upon this Court. 28 U.S.C. § 2254(d), and *Sumner v. Mata, supra.*

### B. Conclusions of Law

■ The United States Supreme Court has clearly stated that in evaluating in-court identification the primary evil to be avoided is "a very substantial likelihood of irreparable misidentification." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972), ("quoting" *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)). To this end a suggestive pre-trial identification must not have tainted the in-court identification. This Court must therefore determine whether the pre-trial lineup was too suggestive. The test for deciding whether a lineup is overly suggestive was set forth by the Supreme Court in *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). Thus, this Court must determine by the "totality of the circumstances," was the conduct of identification procedures ... so unnecessarily suggestive and conducive to irreparable mistake and identification as to be a denial of the process of law?" *Foster v. California, supra,* 394 U.S. at 442, 89 S.Ct. at 1128 ("quoting" *Sovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967)).

The types of circumstances that make a lineup overly suggestive are catalogued in *United States v. Wade,* 388 U.S. 218, 232–34, 87 S.Ct. 1926, 1935–36, 18 L.Ed.2d 1149 (1967): a lineup in which the suspect is the only representative of his race, or in which a black haired suspect is placed among a group of entirely blond haired men, or if the suspect is of remarkably different height than the other members of the lineup. Similarly, a lineup in which the suspect is much younger, or older than the other participants may be impermissible. Differences in dress or hair style between the suspect and other participants could result in an improper lineup. In short, any artificial circumstance that shouts out at the viewer and distracts him from consideration of the other participants would render a lineup impermissibly suggestive.

Applying the findings of fact, *supra,* to these principles of law, the Court finds nothing in the record which in any way establishes that the lineup was violative of federal constitutional law or that it in any way tainted the in-court identification. Accordingly, Claim VII is DENIED.

## CONCLUSION

For the reason stated above, the Court concludes that there is no merit to the petition, and will therefore enter this same date a Judgment in favor of the State and against the petitioner, dismissing this cause with prejudice.

## APPENDIX I

## IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

ARTHUR LEE JONES, Petitioner,

v.

STATE OF ALABAMA, Respondent
CASE NO.

DEC 12 1984

## ORDER

Based on all the evidence before the Court, including the record of the trial and sentence proceedings and all the evidence presented at the hearing held on December 10, 1984, this Court enters the following findings of fact and conclusions of law:

(1) Petitioner Jones was represented at trial by Attorney Reynolds Alonzo and Attorney John W. Coleman. Mr. Alonzo and Mr. Coleman are two of the most experienced and capable criminal defense attorneys in Mobile County. Mr. Alonzo has 20 years experience in law, and 70 percent of his practice during that 20-year period has been criminal defense work. He has represented thousands of criminal defendants in the past 20 years and has personally tried approximately 300 felony trials. His experience includes the trial of capital cases, some of them occurring since the *Furman* decision in 1972.

(2) Mr. John W. Coleman has been practicing law in Mobile County for 21 years, and approximately 70 percent of his practice has been criminal defense work. In addition to having represented thousands of criminal defendants, Mr. Coleman has personally tried over a hundred felony trials. He has been trial counsel or co-counsel in at least one post-*Furman* capital case before the present one.

(3) Mr. Alonzo was appointed to represent the Petitioner on January 29, 1982. After the initial indictment was nol prossed and the Petitioner was reindicted, Mr. Alonzo was reappointed on September 29, 1982. Prior to Petitioner's trial in November of 1982, a problem developed between Petitioner and Mr. Alonzo. The problem concerned Petitioner's dissatisfaction with the manner in which Mr. Alonzo was handling certain issues in the case. More specifically, Petitioner was dissatisfied with the manner in which Mr. Alonzo was handling the issues involving the preliminary hearing, the line-up, and a civil suit which Petitioner wanted Mr. Alonzo to file against the District Attorney, a police officer, and others. Petitioner wrote a letter dated October 24, 1982, in which he expressed or reiterated his dissatisfaction to Mr. Alonzo. Thereafter, Mr. Alonzo filed a motion dated October 29, 1982, in which he requested to withdraw from the representation of Petitioner. After discussing the matter with Mr. Alonzo, the Court determined that the problem between Mr. Alonzo and Petitioner was not an irreconcilable one, and that it could conceivably be remedied by appointment of a co-counsel to assist Mr. Alonzo. That was done when the Court, on November 9, 1982, appointed Attorney John W. Coleman to represent Jones as co-counsel with Mr. Alonzo.

(4) After Mr. Coleman was appointed to act as co-counsel with Mr. Alonzo, the problem between Petitioner and Mr. Alonzo was solved. After the appointment of Mr. Coleman, both Mr. Alonzo and Mr. Coleman got along well with the Petitioner, communicated adequately, and were not hindered in their representation of Petitioner by any personality problem, conflicts, or dispute

over legal strategy. The new relationship between Mr. Alonzo and Petitioner is reflected in a November 12, 1982, motion which Mr. Alonzo and Mr. Coleman filed to dismiss the indictment on three grounds which Jones had originally insisted that Alonzo raise. Although that motion was denied by the Court, it was filed to placate Petitioner and apparently had the effect of doing so. There were no difficulties between Petitioner on the one hand and Mr. Alonzo and Mr. Coleman on the other hand which affected in any way the quality of the representation rendered by the attorneys.

(5) Both Mr. Alonzo and Mr. Coleman investigated the case. This investigation included talking with Petitioner on numerous occasions. Mr. Alonzo discussed the case, the facts, and strategy with Mr. Jones on more than a half-dozen occasions, and Mr. Coleman discussed the case, the facts, and strategy with Petitioner at least a half-dozen times himself. Mr. Coleman has discussions with the Petitioner both in the presence of Mr. Alonzo and outside the presence of Mr. Alonzo. The communication between Petitioner and his attorneys was open, free and uninhibited. The nature of the investigation conducted by the attorneys was influenced by the facts as related to them by Petitioner. In addition, both attorneys had completely free and open access to the District Attorney's file in the case prior to trial. Included in that file were witness statements, summaries of evidence, forensic reports, and everything that the State of Alabama knew about the case. This open and free access to the file resulted from a motion to produce filed by Attorney Alonzo. It materially aided the defense investigation of the case and enabled the attorney to develop the best possible strategy for defending the case.

(6) In addition to reviewing the evidence which the State had, the attorneys' investigation included interviews of a number of witnesses. One or both defense attorneys interviewed before the trial prosecution-witness Sgt. Boone and prosecution-witness John "Shorty" Banks, who was the principal witness against the defendant. In addition, both attorneys spent considerable time in diligently pursuing potential alibi witnesses as named by the Petitioner. The attorneys interviewed the following alibi witnesses prior to trial: Johnny Dockery, Hubert Brown, the Petitioner's wife, and Bobby Vaughn. The attorneys also made a diligent, but unsuccessful, effort to locate the following alibi witnesses: Johnny Clemmons and Johnny Lane. They also tried to find Priscilla Cunningham, but were unable to do so. Dockery, Brown, and Mrs. Jones were called as alibi witnesses at trial at the insistence of Petitioner. Bobby Vaughn was not called as an alibi witness, because he could not be located for purposes of the service of a subpoena. Because of the defense attorneys' diligent efforts to locate Vaughn, Vaughn heard that they were looking for him and called them on two occasions to discuss the case with them. He promised them that he would be present for trial, but he did not show up. They attempted to have a subpoena served on him but that subpoena was returned because he could not be found.

(7) The Court finds that even if Bobby Vaughn had shown up to testify at trial, it would not have made any difference in the result. That is true because Vaughn has a long criminal record, a terrible reputation, and is one of the biggest drug dealers in this part of the state. There is simply no reasonable likelihood that any jury would have believed anything that Vaughn had said. The same is true of Johnny Clemmons and Johnny Lane, additional alibi witnesses whom the defense attorneys attempted unsuccessfully to locate. Indeed, all of the alibi witnesses, both those who testified and those whom the attorneys could not locate, either had bad criminal records or terrible reputations and were, in fact, not believable. The same is true of the additional alibi witnesses whom Petitioner claims he told the defense attorneys about. Petitioner claims that he told defense attorneys about two women, named Chastine and Preston, who would testify to his alibi. Petitioner admits that both these women were prostitutes. In

any event, this Court finds that Petitioner did not tell either of his attorneys about those two women, nor did he tell them about a man named Larry Shakir, a reported alibi witness who Petitioner had met while Petitioner was in prison. In actual fact, the two defense attorneys diligently attempted to locate, interview, and subpoena for trial every alibi witness whom Jones mentioned to them.

(8) The attorneys advised Petitioner against presenting an alibi defense at trial, because all of his alibi witnesses, both those who were located and those who were not, were disreputable, unbelievable witnesses. However, after being fully informed and advised on the subject, Petitioner willingly and voluntarily insisted that the alibi witnesses be presented. The defense attorneys properly acquiesced in that insistence because Petitioner freely chose that course of action despite their advice to the contrary. The Court agrees with the attorneys that it would probably have been better strategy not to present the alibi witnesses, but the Court also agrees with the attorneys that Petitioner had the right to insist on such a defense and he exercised that right.

(9) Based on their thorough investigation of the case, and after discussing the matter with Petitioner, the defense attorneys settled upon a clear strategy for defending the case. Their strategy was to insist that the State be held to its burden of proving beyond a reasonable doubt the guilt of the defendant, which would require that the identification of Petitioner by witness John Banks be believed. Accordingly, the principal strategy of the defense was to attack by every means possible Banks' identification of Petitioner as the man who left with the victim shortly before the victim was killed. As Petitioner himself noted in a November 29, 1982, letter to Attorney Coleman (State's Exhibit No. 1), the defense attorneys did a very good job of attacking the identification of Petitioner by Banks. The Court recognizes that Petitioner's evaluation of the job that his counsel did is not binding on the Court; nonetheless, the Court does note its agreement with that

particular opinion of Petitioner. The defense attorneys did the best job they could in pointing out all available weaknesses and inconsistencies in Banks' identification of Petitioner. Banks was a crucial witness for the State, and it was reasonable to adopt the principal strategy of undermining by all possible means his identification of the Petitioner.

(10) In addition, at Petitioner's insistence, the defense also put forward as part of its strategy an alibi defense. The defense did not put forward an insanity defense, because there was no basis whatsoever for such a defense. Indeed, there was no basis whatsoever for even requesting a psychiatric exam of Petitioner for purposes of the trial or sentence proceeding.

(11) The defense did not request that the opening and closing arguments of the guilt stage be transcribed, because the practice in this Circuit is to record only comments to which objections are made. While the plain error rule does exist in capital cases, and in some limited instances obviates the necessity of an objection, it was reasonable for the defense attorneys not to request that the opening and the closing statements at the guilt stage be transcribed. Between them, they had approximately 40 years of experience in criminal defense work, and it was not unreasonable for them to be confident that they would recognize and duly object to any erroneous statements by the prosecutor.

(12) The defense decision to waive an opening statement at the guilt stage was a deliberate strategic one which was reasonable under the circumstances. Both attorneys concurred in that strategy because they did not want to pin themselves down to what the evidence might or might not show. That is not an unusual tactic of criminal defense attorneys, nor is it an unreasonable one, particularly in a case such as this one. In regards to Petitioner's argument that the attorneys should have used the opening statement to familiarize the jury with principles of law and the application of law to the facts in the case,

that is not the proper function of an opening statement. Had the attorneys attempted to use the opening statement for that purpose, the Court would have sustained an objection to it. Nor was it unreasonable for the attorneys to forego the use of the opening statement to tell the jury about the alibi witnesses and warn the jury about the criminal record of those witnesses. As one of the attorneys noted at the hearing, that would foreclose the defense from not calling those alibi witnesses. It was a reasonable decision to leave open the possibility that such witnesses might not be called, depending upon how the case developed and what Petitioner's views on the subject were at the end of the prosecution's case.

(13) At the sentence stage before the jury, the defense waived an opening statement. The decision to do so was a deliberate strategic decision which was not unreasonable under the circumstances. The Petitioner had a terrible criminal record, a bad reputation, and nothing in his history which would suggest any reasonable mitigating circumstances. Accordingly, the defense did not want to risk opening the door to the prosecution offering evidence which might not otherwise come in against Petitioner. The defense did not call any life-history or character witnesses simply because there were none, or at least there were none who would not have done more harm than good. The defense did not call Petitioner's wife as a witness at the sentence stage because she was a reluctant witness at the guilt stage, and might have made a bad witness for Petitioner at the sentence stage. The overall defense strategy at the sentence stage was to minimize the damage the prosecution could do in bringing out Petitioner's prior criminal record and life history and keep out as much of that material as possible.

(14) Both defense attorneys tried to talk Petitioner out of testifying or giving a statement at the sentence stage because they thought it would do more harm than good. However, Petitioner insisted on taking the stand at the sentence stage and making a statement. The defense attorneys properly allowed him to do so, even though it was against their better judgment and advice. Petitioner's decision to take the stand at the sentence stage was one which he himself voluntarily made after being fully informed of the reasons he should not do so.

(15) The defense waived closing argument at the sentence stage before the jury for a reasonable strategic reason. The assistant district attorney in the opening part of his closing argument indicated that he would have more to say to the jury about why they should sentence the defendant to death during the closing part of his closing argument. However, by waiving their closing argument, the defense effectively prevented Mr. Copeland from making his strongest arguments in favor of the death penalty. This is not an unusual nor an unreasonable tactic. Indeed, one of the defense attorneys had used it successfully against the same prosecutor in an earlier felony trial.

(16) Throughout the pre-trial and trial and sentence proceedings, the defense attorneys were very careful to discuss every tactical and strategic decision with Petitioner. After discussing such decisions with Petitioner, they either got his consent to the course of action which they advised or they followed Petitioner's wishes, even though it was against their advice. This was a proper course of action for them to follow, because the Petitioner is an intelligent and articulate individual, and it was, in fact, his life which was at stake. More specifically, the Court finds that the defense attorneys consulted Petitioner and obtained his knowing and intelligent consent to, among other things, waive the opening statement at the guilt stage, waive the opening and closing statements at the sentence stage, and not present any character or life-history witnesses at the sentence stage of the proceeding.

(17) Contrary to the implication of some parts of Petitioner's testimony, the defense attorneys did show Petitioner the presentence report prior to the sentencing decision by the Court. After reviewing the

presentence report, Petitioner indicated that there were no inaccuracies in it, and that indication was communicated to the Court. Petitioner's present statements that his 1970 robbery conviction and life sentence were nolle prossed and are no longer valid are simply not true. The presentence report is accurate in its entirety.

(18) Petitioner testified that he was not present during jury voir dire and selection. The Court finds that not to be true. The Court always insists upon the defendant being present during the jury selection process, and the Petitioner was present during the jury selection process at his trial.

(19) Petitioner testified that Attorney Coleman never met with him until the day of the trial. The Court finds that that is not true. Attorney Coleman was appointed to act as co-counsel on November 9, 1981, and he met with Petitioner on either that day or on November 10, 1981. He also met with Petitioner on other occasions prior to trial.

(20) Attorney Coleman was not present during the jury voir dire selection process; however, Attorney Alonzo was. Attorney Coleman was in another court during the very early part of the prosecution's case in this trial. However, he appeared early in the prosecution's case. The record reflects that he was present and conducted voir dire of prosecution witness John Banks. He remained in the trial from at least that early point through its conclusion. In addition, Attorney Alonzo was present at all stages of the trial.

(21) Defense attorney Alonzo did testify that he did not consider presenting an "expert" witness to testify about the fallibility of eye witness testimony. However, there is no indication that such testimony would have been admissible under Alabama law even if it had been presented. Moreover, the defense attorneys did do a great deal to demonstrate the fallibility of eye witness testimony through the cross-examination of John Banks. The Court finds that their failure to call an "expert" witness to give his opinion about eye witness testimony did not amount to ineffective assistance of counsel. This Court has presided over the trial of a number of cases in which the State depended upon eye witness testimony, and no expert has ever been offered to testify about the fallibility of eye witness testimony. Nor has the Court been made aware of any such expert being proffered in any case in this Circuit or in the State of Alabama.

(22) Based on the evidence before the Court, which includes the trial and sentencing transcripts (Record on Appeal), the Court file, the exhibits introduced at this Coram Nobis hearing, and the testimony and demeanor of all the witnesses who testified at this hearing, the Court concludes that the testimony of Petitioner at this hearing was not credible. In making this determination, the Court has considered both Petitioner's demeanor at this hearing and his long and sordid criminal record. More specifically, the Court finds that Petitioner was not truthful on those points where his testimony conflicted with that of the two defense attorneys.

(23) Based on all the evidence before it, this Court concludes that Petitioner has failed to establish that his counsel were ineffective under the tests and standards set down in *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In addition, this Court also finds that Petitioner was not convicted and sentenced to death because of any shortcomings or actions of his attorneys, but was instead convicted and sentenced to death because the State proved his guilt beyond a reasonable doubt and also established that death was the only proper and just sentence given Petitioner's record and the nature of the crime which he committed.

(24) Petitioner alleges that he is presently insane. After due consideration of the evidence and applicable law, the Court finds the Petitioner to be sane and, therefore, competent to be executed.

(25) Petitioner presented no evidence of present insanity. The State, moreover, presented more than sufficient evidence to satisfy the legal criteria enunciated in *Gray v. Lucas*, 710 F.2d 1048 (5th Cir.

1983), which the Court will assume to be incorporated into § 15–16–23 for purposes of deciding this case. The following facts amply support the Court's findings:

(a) Through Dr. Harry McClaren, Chief of Psychology, Taylor Hardin Secure Medical Facility, the State introduced into evidence Petitioner's Forensic Evaluation Report (State's Exhibit No. 4). A copy of that report is attached to and made a part of the Court's Order.

(b) Dr. McClaren, moreover, testified that he (1) was a member of the Board which evaluated the Petitioner and (2) personally interviewed the Petitioner on two occasions. Based on his expert qualifications, his interviews with the Petitioner, and his review of Petitioner's psychological test results, Dr. McClaren stated, and the Court finds that:

(1) Petitioner possesses sufficient intelligence to understand the proceedings against him;

(2) Petitioner knows he was tried for capital murder;

(3) Petitioner knows he is to be executed for committing that murder;

(4) Petitioner possesses sufficient understanding to know facts which would make his punishment unjust or unlawful. Indeed, Petitioner testified that there were witnesses who could account for his whereabouts at the time of the murder, and he told Dr. McClaren that he was the victim of a conspiracy between the District Attorney and the Mobile Police Department.

(26) Petitioner contends that his evaluation at the Taylor Hardin facility was done in too short a period of time to be reliable. The Court finds to the contrary, especially since there is nothing in Petitioner's past history to indicate the presence of any type of periodic or episodic mental disorder or defect. Dr. McClaren testified that Petitioner was at Taylor Hardin from November 30, 1984 to December 6, 1984. Dr. McClaren stated, and the Court agrees, that this is ample time to conduct a proper psychiatric evaluation.

(27) Since the Petitioner testified in his own behalf, the Court had opportunity to observe the demeanor of the Petitioner and his response to questions propounded by opposing counsel. The Petitioner is not only of at least average intelligence, but also is at least as articulate as the average person.

(28) Petitioner can, and does, recall details of his trial on the instant charge. He related the names of witnesses who were and were not subpoenaed to testify in his behalf. He referred to the testimony of prosecution witness John "Shorty" Banks as "perjured". He expressly stated that he knew he was charged with capital murder and even testified that a superceding indictment was returned against him on September 28, 1981.

(29) The Court, therefore, finds from its observation of the Petitioner and due consideration of his testimony that he is sufficiently intelligent to, and does, understand the proceeding against him, is capable of understanding relevant facts and communicating them to counsel, and, therefore, was, and is, sane.

(30) The Court has not addressed the merits of Petitioner's claims that capital punishment in general and electrocution in particular are cruel and unusual punishment violative of the Eighth and Fourteenth Amendments. Such claims are barred from review in the Coram Nobis proceeding, because they could have been but were not raised at trial or on appeal. While Alabama does have a plain error rule applicable to death-sentence cases, these two claims are not within the scope of that rule. Even if they were, the plain error rule is relevant only on direct appeal and does not operate to redeem for Coram Nobis purposes a claim barred because it was not raised at trial or on appeal.

(31) The Court also has not addressed Petitioner's claim that he is innocent. Coram Nobis does not extend to such a claim, except insofar as it is based on newly discovered evidence which was not and could not have been known through the exercise of reasonable diligence at the time of trial.

Petitioner has not proffered any such newly discovered evidence. In addition, and in the alternative, Petitioner is not innocent. At trial, the State proved his guilt beyond a reasonable doubt.

Based on the foregoing fact findings and conclusions of law, the Petition for Writ of Error Coram Nobis is denied.

The Motion for Stay of Execution is also denied.

DONE this the 11th day of December, 1984.

ORIGINAL SIGNED BY:
/s/ Braxton L. Kittrell, Jr.
BRAXTON L. KITTRELL, JR.
Circuit Judge
Thirteenth Judicial Circuit