DYTHIAN THEOLAEF ROBESON a/k/a Dykie *v.*
STATE OF MARYLAND

[No. 997, September Term, 1977.]

*Decided May 12, 1978.*

The cause was submitted on briefs to LISS, WILNER and COUCH, JJ.

Submitted by *Alan H. Murrell, Public Defender,* and *Mark Colvin, Assistant Public Defender,* for appellant.

Submitted by *Francis B. Burch, Attorney General, Diane G. Goldsmith, Assistant Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Roy Breslow, Assistant State's Attorney for Baltimore City,* for appellee.

LISS, J., delivered the opinion of the Court.

Appellant, Dythian Theolaef Robeson a/k/a Dykie, was convicted by a jury in the Criminal Court of Baltimore of first degree murder, assault with intent to murder and two counts of the use of a handgun in the commission of a crime of violence. Sentences were imposed and it is from these judgments that this appeal was filed.

Appellant raises six contentions on appeal which he states as follows:

"1. Did the trial court err in admitting evidence of Appellant's pre-trial silence?

"2. Was the evidence insufficient to sustain Appellant's first degree murder conviction?

"3. Did the trial court err in denying Appellant's motion for a new trial based upon newly discovered evidence?

"4. Was Appellant improperly convicted of and sentenced for both first degree murder and use of a handgun in the commission of a crime of violence?

"5. Did the trial court commit plain error in failing to instruct the jury as to the definition of use of a handgun in the commission of a crime of violence?

"6. Was Appellant denied the effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution?"

We find no merit in any of these contentions and shall affirm.

1.

The evidence produced at trial indicated that on December 27, 1976 Officer Thomas Wade responded to a call in the 800 block of George Street to investigate a shooting. On his arrival at the scene he observed three persons standing near a station wagon, the right side window of which had been shattered. A spent bullet was found in the door on the driver's side. Lying in the gutter face down was a dead black male later identified as Stilton Jones, nicknamed "Cookie." Harry Johnson, the owner of the station wagon, testified that on that day he went to 851 George Street to purchase $25 worth of heroin from the appellant but was advised that he could only buy a $50 packet. Johnson saw Cookie there as a customer, and although he had never seen Cookie before, he suggested that they pool their funds and buy a $50 packet of heroin. Cookie agreed and the transaction was completed. Johnson, Cookie and a friend of Cookie's named McEachin then went to a nearby apartment and injected the heroin. They were disappointed with the quality of the heroin and returned to the appellant's apartment to complain. Cookie and Johnson went in and Johnson left to return to his vehicle. McEachin was seated in the back of the car. Cookie came out and got into the front passenger's seat. Appellant came out of the building and motioned to Cookie to come to him. Cookie

walked toward the appellant and Johnson heard two shots. A second or two later the appellant was at the front passenger's side of the car and shot Johnson in the head. Johnson was able to drive to the hospital where he was treated. Johnson stated he did not actually see the appellant shoot Cookie.

McEachin's testimony was essentially the same as Johnson's except that McEachin stated that he saw Jones and the appellant together, heard one or two shots and then saw Cookie fall to the ground. He saw the second shot fired and saw the appellant holding the gun. His testimony as to the shooting of Johnson was identical to that of Johnson himself.

Appellant, supported by his girl friend as a witness, testified on his own behalf that he knew Cookie as a narcotics pusher and that on the night in question he and his girl friend were leaving his apartment preparing to go to a restaurant when he heard two shots, then heard a car speeding away. He stated that he arranged for an ambulance to be called for Cookie and was still on the scene when the police arrived. He denied shooting Cookie, denied selling narcotics and said he did not have a gun.

On cross-examination the prosecutor, over objection, was permitted to question the appellant as to whether he had advised the police of this alleged sequence of events. Appellant contends that he had a right under the Fifth Amendment to the United States Constitution to *pre-arrest silence* and that the State violated this right by eliciting from him, during his cross-examination, the fact that he had failed to contact the police and advise them of his knowledge of the events surrounding the murder.

We do not believe, under the circumstances in this case, that the appellant's actions in not communicating with the police amount to "silence" in the constitutional sense of that word. "Silence" in the constitutional sense is the Fifth Amendment right to remain silent when confronted by one's accusers following an arrest or in a custodial interrogation setting. Evidence of a defendant's silence under those circumstances is not admissible because: (1) the admission of such evidence would infringe upon his Fifth Amendment

right to remain silent, *Doyle v. Ohio,* 426 U. S. 610, 96 S. Ct. 2240, 49 L.Ed.2d 91 (1976); *Younie v. State,* 272 Md. 233, 322 A. 2d 211 (1974); *Sutton v. State,* 25 Md. App. 309, 334 A. 2d 126 (1975); and (2) silence at the time of arrest lacks significant probative value and carries with it too great a potential for prejudice, *United States v. Hale,* 422 U. S. 171, 95 S. Ct. 2133, 45 L.Ed.2d 99 (1975).

The question presented here for the first time to a Maryland appellate court, is whether the identical restrictions apply to cross-examination concerning "pre-arrest silence" with respect to exculpatory testimony offered by a defendant for the first time at the trial on the merits.

We believe it is necessary to set out in detail the cross-examination which is questioned by this appeal and here reproduce it as follows:

"Q [By assistant state's attorney] Did you move out of your house?

A [By appellant] Yes, I did.

Q You were hiding from the police, weren't you?

A Not really hiding.

Q Well, you knew a warrant was out for your arrest, didn't you?

A Yes, I did.

Q You were hiding?

A I was.

Q Had you your suitcases there?

A Yes, I did.

Q You had all your clothes there?

A Yes, I did.

Q In a separate room; didn't you?

A From hers.

Q In her house?

A Yes, I did.

Q There was a bed in that room, wasn't there?

A Yes, it was.

Q You were hiding from the police?

A I was staying there temporarily until, you know, I could hear the, you know, the results of this, you know. Because I knew I didn't do it, and I wasn't the only one that they said did it at the time, because the police come into the restaurant and said they had a warrant for someone else for it. And then I heard they had a warrant for me for a period. And I didn't want to get arrested for no homicide I know I didn't do it. So, I did, you know, leave my mother's house.

Q Until January 3rd, until you were arrested; right?

A Yes.

Q You didn't tell the police what happened. Did you go down to the police and tell them you had nothing to do —

MR. SUTLEY: I would object, your Honor.[1]

THE COURT: I think that is a perfectly proper question. I will take the answer.

Q (BY MR. BRESLOW) Did you ever tell the police what happened?

A No, I didn't. I told them what I knew after, you know, after —

THE COURT: You didn't tell them voluntarily; did you?

THE WITNESS: No, I didn't.

THE COURT: That is what the State wants to know.

Q (BY MR. BRESLOW) You didn't call the police and tell them that you were innocent?

A No, I didn't.

Q You didn't know why the warrant was out for your arrest?

A No, I didn't.

Q You were with Rose Munford, you didn't tell them that?

A No, I didn't.

---

[1]. It is noted that this was the first and only objection to this line of questioning.

Q That you were having tea?

A No, I didn't.

Q You didn't tell the police that; did you?

A No, I didn't.

Q Why not?

A I didn't tell them that until after I was apprehended. The reason I didn't call before was because, you know, I knew I would get locked up.

Q Because you did it?

A No, no, no.

Q Then why didn't you tell them?

A Why don't I call voluntarily?

Q And tell them?

A Because, you know, it was Christmas, a holiday. I didn't want to be locked up — I would have been locked up any way.

Q Because you committed this crime?

A Not because I committed the crime.

Q Why did you know you would be locked up?

A Because I know the procedure you go through.

Q Yes, when you commit a crime they arrest you?

A No, that's not the reason.

Q Well, what is the reason; I'm asking you?

A Because I didn't want to be locked up.

Q During the Christmas holidays?

A Right.

Q But the Christmas holidays were over.

A The New Year's.

Q Well, you were out for New Year's; weren't you?

A Yes, I was.

Q Did you call the police on January 2nd?

A No, I didn't.

Q January 3rd?

A No, that was the day I got locked up. That was the day they caught me."

*Doyle v. Ohio, supra,* and its progeny, stand for the proposition that a defendant has an absolute right to remain silent after arrest and the giving of the rights prescribed by *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), and that the use of his silence for impeachment purposes under these circumstances is violative of the Due Process Clause of the Fourteenth Amendment. *See: Reid v. Riddle,* 550 F. 2d 1003 (4th Cir. 1977). Similarly, as stated in *Younie v. State, supra,* and *Sutton v. State, supra,* a prosecutor may not comment on defendant's silence during police custodial interrogation. Appellant urges this Court to extend the holding in *Doyle* and to declare that he has a constitutional right to remain silent prior to arrest and prior to receiving *Miranda* warnings and that that right was violated by the cross-examination in this case.

In support of this proposition the appellant relies primarily on a series of cases decided by the intermediate appellate courts of Florida. The cases are *Brooks v. State,* 347 So. 2d 444 (Fla. App. 1977); *Webb v. State,* 347 So. 2d 1054 (Fla. App. 1977) and *Weiss v. State,* 341 So. 2d 528 (Fla. App. 1977). *Weiss* and *Brooks* were decided by the Third District Court of Appeals of Florida and *Webb* by the Fourth District Court of Appeals of Florida.

When these cases are examined, however, they are found to be factually inapposite. In *Weiss v. State,* the prosecutor asked a defendant, "Did you, at any time, ever receive an offer or an invitation to come to the State's Attorney's Office and explain your position to us, prior to your arrest?" and later was asked, "Did you at any time before you testified today, sir, give an account of the events that occurred that evening to anyone other than your counsel?" *Id.* 341 So. 2d at 530. The opinion is silent as to whether the defendant answered the questions, but the inquiries were emphasized again by the prosecutor when he argued to the jury as follows:

> "He has not talked to anybody other than his attorney even though in the five or six days, in the interim between the time that this incident occurred at Jackson Memorial Hospital and the time that he

was arrested, he never bothered to come up and say, 'I understand you are investigating me. Here is how it happened. I never laid a hand on this man'. . . . [H]e does not even bother to tell a soul until some three or four or five months after this happened, here this afternoon. You can form your own conclusion on that." *Id.* at 530.

The trial court rejected a motion for a mistrial, and the District Court of Appeals reversed on the following grounds:

"In following his attorney's advice and refusing to testify or offer any explanation to either the State Attorney or the Internal Security Division prior to his arrest, appellant was simply availing himself of his constitutional guarantee of freedom from self-incrimination. U.S. Const. Amends. V, XIV.

"We are therefore of the opinion that the claimed privilege of silence was constitutional in dimension; therefore, it was reversible error not to grant appellant a mistrial when the prosecution attempted to utilize said silence for impeachment of credibility purposes. *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Shannon v. State,* 335 So.2d 5 (Fla. 1976); *Bennett v. State,* 316 So.2d 41 (Fla. 1975).

"In addition, and notwithstanding our aforementioned ruling concerning the applicability of the fifth amendment to the case *sub judice,* we hold that even if the above constitutional safeguard was inapplicable here, evidence of appellant's silence for impeachment purposes, in light of appellant's attorney's advice to appellant not to testify during the administrative investigation, lacked any real probative value and was so overly prejudicial to appellant's case as to constitute reversible error. c. f. *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975)." *Id.* at 530.

We note a substantial factual difference between *Weiss* and the case *sub judice, i.e.,* in *Weiss* the pre-trial silence was predicated upon the advice of the defendant's attorney that

the defendant remain silent during the course of a prior administrative investigation. We also conclude that the District Court's reliance upon *Doyle* is misplaced since, as we shall hereafter demonstrate, the holding of the Supreme Court in *Doyle* is a much narrower one than that in *Weiss.*

*Webb v. State, supra,* is also distinguishable because there the silence which was the subject matter of the appeal occurred after the appellant's arrest. The state attempted to cross-examine the accused as to his failure to advise the police of an alibi to which he testified for the first time at the trial. The state contended that the cross-examination with respect to his silence was admissible because the record did not disclose that the appellant had been given his *Miranda* warnings. The District Court of Appeals of Florida held that *Doyle, supra,* was controlling and as its reasons stated the following:

> "[W]e note that, while *Miranda* warnings make it even more offensive to use a person's silence upon arrest against him, the absence of such warnings does not add to nor detract from an individual's Fifth Amendment right to remain silent. If one has a right upon arrest not to speak for fear of self-incrimination, then the mere fact the police call his attention to that right does not elevate it to any higher level." *Id.* 347 So. 2d at 1056.

In this case we note that the cross-examination was with reference to pre-arrest conduct only.

*Brooks v. State, supra,* is also inapposite. In that case the alleged silence occurred during the police investigation of a stabbing. The facts in that case clearly indicate that the silence was justified under the Fifth Amendment. The accused, who was an eyewitness, did not speak up when the person who committed the stabbing gave an exculpatory and false statement to the police. From these circumstances, in a trial in which the eyewitness was charged with participating in the crime, the prosecutor argued that the accused's failure to contradict the co-defendant's story to the police was proof that he was a party to the crime. The District Court of

Appeals reversed on the ground that the argument was prejudicial.

Appellant also urges that *People v. Sheperd,* 551 P. 2d 210 (Colo. App. 1976) should persuade us of the validity of his contention. We find, however, upon examination of *Sheperd* that the Colorado Court of Appeals noted, "The People concede that the right of an accused to remain silent exists prior to arrest and that thus the prosecutor is generally foreclosed from alluding to the exercise of that right in questions propounded to the defendant." There is no such concession in this case. To the contrary the State vigorously contends that, while an accused may be entitled to pre-arrest silence, this does not preclude the State's right to cross-examine as to the reasons for that silence, particularly where the accused takes the witness stand and offers an exculpatory statement or alibi for the first time at the trial on the merits.

Appellant also relies heavily on *United States v. Hale, supra.* In that case the defendant was arrested for robbery and was taken to the police station where, after having been advised of his right to remain silent, he made no response to an officer's inquiry as to the source of money found on his person. The defendant testified at his trial. In an effort to impeach his alibi, the prosecutor by his cross-examination was able to establish that the accused did not offer the exculpatory information to the police at the time of his arrest. The Supreme Court reversed but gave as its rationale for the reversal the following:

> "In most circumstances silence is so ambiguous that it is of little probative force. For example, silence is commonly thought to lack probative value on the question of whether a person has expressed tacit agreement or disagreement with contemporaneous statements of others. See 4 Wigmore Section 1071. Silence gains more probative weight where it persists in the face of accusation, since it is assumed in such circumstances that the accused would be more likely than not to dispute an

untrue accusation. Failure to contest an assertion, however, is considered evidence of acquiescence only if it would have been natural under the circumstances to object to the assertion in question. 3A Wigmore Section 1042. The *Raffel* Court found that the circumstances of the earlier confrontation naturally called for a reply. Accordingly, the Court held that evidence of the prior silence of the accused was admissible. But the situation of an arrestee is very different, for he is under no duty to speak and, as in this case, has ordinarily been advised by government authorities only moments earlier that he has a right to remain silent, and that anything he does say can and will be used against him in court.

"At the time of arrest and during custodial interrogation, innocent and guilty alike — perhaps particularly the innocent — may find the situation so intimidating that they may choose to stand mute. A variety of reasons may influence that decision. In these often emotional and confusing circumstances, a suspect may not have heard or fully understood the question, or may have felt there was no need to reply. See Traynor, The Devils of Due Process in Criminal Detection, Detention, and Trial, 33 U. Chi. L. Rev. 657, 676 (1966). He may have maintained silence out of fear or unwillingness to incriminate another. Or the arrestee may simply react with silence in response to the hostile and perhaps unfamiliar atmosphere surrounding his detention. In sum, the inherent pressures of in-custody interrogation exceed those of questioning before a grand jury and compound the difficulty of identifying the reason for silence.

Respondent, for example, had just been given the *Miranda* warnings and was particularly aware of his right to remain silent and the fact that anything he said could be used against him. Under these circumstances, his failure to offer an explanation during the custodial interrogation can as easily be

taken to indicate reliance on the right to remain silent as to support an inference that the explanatory testimony was a later fabrication. There is simply nothing to indicate which interpretation is more probably correct." (Footnote omitted). *Id.* 422 U. S. at 176-77.

In this case, it seems clear to us that the cross-examination complained of by the appellant was permissible in order to establish his conduct after the occurrence of the crime. The appellant testified in his own behalf and in the course of that testimony admitted his presence at the scene when the murder took place. He gave the court and jury a story which exculpated him from any responsibility for the crime. He produced as a witness a girl friend who related the same circumstances to the jury. He admitted under cross-examination, without objection, that he had changed his residence immediately after the shooting and was hiding from the police. He stated that he was hiding because he was afraid that he would be arrested for the crime. All of this evidence was clearly admissible as evidence which tended to show flight on the part of the accused. *King v. State,* 201 Md. 303, 93 A. 2d 556 (1953); *Carter v. State,* 10 Md. App. 50, 267 A. 2d 743 (1970); II J. Wigmore, *Evidence* Section 276 (3d ed. 1940). In *Carter, supra,* at 55 we said, "The failure of a defendant to conduct himself as would an innocent man may show knowledge of guilt." The State in this case had no way to explore that conduct except by cross-examination.

The subsequent questions by the State as to why the accused, an admitted eyewitness, did not contact the police, were germane to his conduct; *i.e.,* his hiding from the police. To deprive the State of the weapon of cross-examination with respect to pre-arrest conduct would in effect leave the defendant in a position where he might fabricate any exculpatory story he chose, to be unveiled for the first time at trial, without the necessity of having to defend his version of the facts against the rigors of cross-examination.

We do not believe that *Doyle v. Ohio, supra,* requires that we extend its holding to pre-arrest, non-custodial silence. The

378

Supreme Court had before it, in *Doyle,* the narrow question of "whether a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining him about his failure to have told the story *after receiving Miranda warnings at the time of his arrest.*" (Emphasis supplied). *Id.* 426 U. S. at 611. That this was, in fact, the sole question decided in *Doyle* is implicit in the language of Mr. Justice Powell, speaking for the majority of the Court, in reaching the conclusion that such cross-examination violated the Due Process Clause of the Fourteenth Amendment. The Court stated:

> "Despite the importance of cross-examination, we have concluded that the *Miranda* decision compels rejection of the State's position. The warnings mandated by that case, as a prophylactic means of safeguarding Fifth Amendment rights, see *Michigan v. Tucker,* 417 U. S. 433, 443-444 (1974), require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. *Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.* See *United States v. Hale,* 422 U.S., at 177, 45 L.Ed.2d 99, 95 S. Ct. 2133. *Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings.* In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (Footnotes omitted; emphasis supplied). *Id.* 426 U.S. at 617-18.

Mr. Justice Stevens, in his dissenting opinion, pointed out that *Doyle* was a case in which the defendants' silence at the

time of their arrest was graphically inconsistent with their trial testimony that they were the unwitting victims of a "frame-up" in which the police did not participate. He suggested that if the defendants had been framed, their failure to mention that fact at the time of their arrest was inexplicable, and that under accepted rules of evidence their silence was tantamount to a prior inconsistent statement and admissible for purposes of impeachment. *Doyle, supra,* 622. III A J. Wigmore, *Evidence* Section 1042 (Chadbourn rev. 1970). Justice Stevens noted that so far as the Fifth Amendment privilege was concerned, a defendant who voluntarily foregoes his privilege not to testify and presents exculpatory or mitigating evidence, subjects himself to relevant cross-examination without the right to reclaim Fifth Amendment protection on a selective basis. *Fitzpatrick v. United States,* 178 U. S. 304, 20 S. Ct. 944, 44 L. Ed. 1078 (1900). In a footnote to *Doyle,* Justice Stevens quoted from *Brown v. United States,* 356 U. S. 148, 154-55, 78 S. Ct. 622, 2 L.Ed.2d 589 (1958) as follows:

> "If he takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination. ' [H]e has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts.' (citation omitted)." *Id.* 426 U. S. at 629 n. 8.

A case similar on the facts to this case was decided in the District of Columbia Court of Appeals. In *Ester v. United States,* 253 A. 2d 537 (1969), a defendant testified that he was present at the scene where a victim was alleged to have been attacked by two men. His version of the crime was that only one man attacked the victim and that he, the second man, actually attempted to assist the victim. He further testified that when the police approached, the assailant ran and the defendant ran after him in an attempt to catch him. The prosecution on cross-examination, over objection, asked the defendant whether he thought to remain on the scene and tell

the police that he witnessed the assault rather than run after the man. The question elicited a negative answer, and counsel for the government commented on this failure to make a pre-arrest statement to the police as to the alleged facts. In rejecting appellant's contention that this was reversible error, the Court stated:

> "*Miranda,* which was cited by appellant to support his position, prohibits comments on an accused's failure to make an exculpatory statement *after* he has been arrested or is under police custodial interrogation.
> "In the instant case, the objected-to cross-examination of appellant and related comments to the jury were limited to the course of action taken by appellant when he was in front of the restaurant and saw the arrival of the police. At that time he was neither under arrest nor under custodial interrogation. Such cross-examination and comments to the jury were proper since they related to credibility and flight of appellant." (Footnote omitted). *Id.* 253 A. 2d at 538.

We hold that on the facts of this case the cross-examination and argument to the jury as to the appellant's pre-trial silence were not impermissible comment on an inference of guilt but rather a permissible inquiry as to credibility and circumstances of flight.

### 2.

Appellant next argues that "[b]ecause the State failed to prove beyond a reasonable doubt that appellant deliberately, willfully, and with premeditation shot and killed Jones, the first degree murder conviction should be reversed." We do not agree. Criminal agency of the appellant was amply demonstrated by the testimony of Johnson and McEachin which, if believed, was more than sufficient to support a first degree murder verdict beyond a reasonable doubt.

Appellant also contends the State produced no evidence that appellant had fully formed an intent to kill Jones. The

Court of Appeals, in *Gladden v. State,* 273 Md. 383, 330 A. 2d 176 (1974), stated the elements necessary to sustain a conviction for first degree murder under Maryland Code Article 27, § 407. It stated:

"In order to sustain a conviction of murder in the first degree . . . the jury must find ' "the actual intent, the fully formed purpose to kill, with so much time for deliberation and premeditation as to convince them, that this purpose is not the immediate off spring of rashness and impetuous temper and that the mind has become fully conscious of its own design." It is not necessary that deliberation and premeditation shall have been conceived or have existed for any particular length of time before the killing. Their existence must be judged from the facts of the case. . . .' *Chisley v. State,* 202 Md. [87] at 106, 95 A. 2d [577] at 586 [1953]. *See also Hyde v. State,* 228 Md. 209, 215-16, 179 A. 2d 421, 424 (1962); *Cummings v. State,* 223 Md. [606] at 611, 165 A. 2d [886] at 888-89 [1960]; *Faulcon v. State,* 211 Md. [249] at 257-58, 126 A. 2d [858] at 862-63 [1956]. If the killing stems from a "choice made as a result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder." ' *Wilson v. State,* 261 Md. 551, 565, 276 A. 2d 214, 221 (1971)." *Id.* 273 Md. at 387.

In this case the jury could have justifiably concluded that the appellant formed the intent to kill before he summoned Cookie out of the car. It could also have determined beyond a reasonable doubt an intent to kill from the firing of two shots separated by an interval of time, which has been held to be sufficient evidence of deliberation and premeditation. *See: Chisley v. State, supra; Cummings v. State, supra* and *Wilson v. State, supra.*

3.

Appellant complains that the trial court erred in denying his motion for new trial based upon newly discovered

evidence. We find no error. Appellant, several weeks after the trial, produced an eyewitness who in essence repeated the stories of appellant and his girl friend. The record discloses that the trial judge concluded that the testimony of the new witness was not newly discovered evidence but "corroboration of what the jury had heard and did not believe." The law is clear that in Maryland the grant or denial of a new trial is a matter within the sound discretion of the trial court and will not be disturbed unless there has been a clear abuse of that discretion. *State v. Devers,* 260 Md. 360, 272 A. 2d 794, *cert. denied,* 404 U. S. 824, 92 S. Ct. 50, 30 L.Ed.2d 52 (1971). Our own review of the proposed witnesses' testimony, when tested against the rule explicated by this Court in *Jones v. State,* 16 Md. App. 472, 298 A. 2d 483 (1973) as to the determination of what is newly discovered evidence, convinces us that the trial court did not abuse its discretion.

4.

Relying on *Newton v. State,* 280 Md. 260, 373 A. 2d 262 (1977), appellant argues he was improperly convicted of and sentenced for both first degree murder and of the use of a handgun in the commission of a crime of violence. In reaching its result in *Newton,* the Court of Appeals grounded its decision on the required evidence test. It stated:

> "Thus, under both federal double jeopardy principles and Maryland merger law, the test for determining the identity of the offenses is the required evidence test. If each offense requires proof of a fact which the other does not, the offenses are not the same and do not merge. However, if only one offense requires proof of a fact which the other does not, the offenses are deemed the same, and separate sentences for each offense are prohibited." *Id.* at 268.

Applying that test, it is obvious that each of the offenses requires proof of a fact or circumstance not required by the other, thus precluding a merger.

## 5.

Appellant urges that the trial court committed plain error in failing to instruct the jury as to the definition of the crime of the use of a handgun in the commission of a crime of violence. No request for such an instruction was made by appellant nor was any exception taken to the trial court's instructions. Under these circumstances, the issue is not preserved for appellate review. Maryland Rule 1085.

## 6.

Appellant contends he was denied the effective assistance of counsel. The alleged incompetency of trial council was not raised, tried or decided below and is therefore not presently before this Court. Maryland Rule 1085; *Boswell v. State,* 5 Md. App. 571, 249 A. 2d 490 (1968). This issue, if it is to be decided at all, must await a proceeding under the Uniform Post Conviction Procedure Act, Code Art. 27, Section 645A *et seq. White v. State,* 17 Md. App. 58, 299 A. 2d 873 (1973). We do note in passing that when the appellant was asked by the trial court whether he was satisfied with the services of trial counsel, his answer was in the affirmative. The trial court expressed his opinion that trial counsel "did a magnificent job in defending you." Under these circumstances, we suggest that this complaint would appear to be frivolous on its face.

*Judgments affirmed.*
*Costs to be paid by appellant.*