**Daniel CAREY**

v.

**STATE OF MARYLAND.**

Civ. No. K–84–329.

United States District Court,
D. Maryland.

July 1, 1985.

Daniel F. Goldstein and Carmen D. Hernandez, Baltimore, Md., for plaintiff.

Diane G. Goldsmith, Asst. Atty. Gen., Baltimore, Md., for defendant.

FRANK A. KAUFMAN, Chief Judge.

Carey, seeking federal habeas corpus relief pursuant to 28 U.S.C. § 2254, challenges his conviction on May 18, 1976 in the Criminal Court of Baltimore City (now the Circuit Court for Baltimore City) for robbery with a deadly weapon and the use of a handgun in the commission of a violent crime. Judge Marshall A. Levin, who presided during Carey's jury trial, sentenced Carey to fourteen and one-half years imprisonment for the robbery charge and to a consecutive five-year term for the handgun violation. On August 19, 1981, plaintiff filed a petition for a writ of habeas corpus with this Court. On January 31, 1983, this Court dismissed that petition without prejudice because of lack of exhaustion of state remedies. Thereafter, after unsuccessfully seeking Maryland Post Conviction Act relief at the trial and appellate levels within the court system of the State of Maryland, plaintiff again filed a petition for a writ of

habeas corpus in this Court, setting forth six claims for relief: (1) the trial court erred in permitting the prosecutor to comment on Carey's postarrest silence; (2) the trial court erred in refusing to give a requested *Telfaire* jury instruction; (3) by inquiring into Carey's financial situation and the disclosure thereof to Carey's defense counsel, the prosecutor infringed upon the attorney-client relationship, thereby preventing effective assistance of counsel; (4) plaintiff was not given *Miranda* warnings; (5) plaintiff's convictions constituted double jeopardy; (6) the trial court erred in permitting the state prosecutor to impeach his own witness.

The relevant facts are not in dispute. William L. Linthicum testified at trial that at about 8:30 a.m. on November 4, 1974, he was robbed at gunpoint of $440 while making insurance collections. The assailant escaped despite pursuit. In January, 1975, Linthicum viewed a photographic array and tentatively selected one photograph as being that of his assailant. At trial, Linthicum testified that when he selected the photograph, he told the police that it was not a positive identification, "But if I ever see him in person, I'll know him when I see him again." Trial Transcript (Tr.), May 13–14, 1976, at 36. The photograph was not that of Carey. At a subsequent line-up in which the man whose photograph Linthicum had selected and Carey both appeared, Linthicum was unable to identify his assailant.

On February 1, 1975, Linthicum was working in a shoe store when he recognized plaintiff, who was a customer in the store, as his assailant. Linthicum told a clerk to call the police and approached plaintiff. After Linthicum accused Carey of being the assailant, Carey left the store. Linthicum pursued Carey, who was subsequently apprehended by the police after a three to four block chase. A police officer testified that upon being arrested, Carey "became very belligerent, and began swinging his arms wildly." *Id.* at 59. At the trial, plaintiff denied being the assailant; also, during the trial, Mr. Linthicum

positively identified Carey as the assailant. On cross-examination, Linthicum remained adamant that Carey was the assailant. *Id.* at 138–39, 153–55.

## I.

### COMMENT ON POSTARREST SILENCE

During cross-examination by the state prosecutor of Carey, the following line of questioning ensued:

MR. KATZ: What happened when the police stopped you?

DEFENDANT CAREY: I started acting all wild and everything.

MR. KATZ: What?

DEFENDANT CAREY: I started acting all wild and everything, I was innocent and it hurt me to my heart to have them say I robbed somebody.

\*   \*   \*   \*   \*   \*

MR. KATZ: The fact that you were that someone who had been charged with armed robbery, you are telling the ladies and gentlemen that you didn't do it and you were only scared because you are on parole, why did that make you act wild?

DEFENDANT CAREY: I was acting wild.

\*   \*   \*   \*   \*   \*

DEFENDANT CAREY: I think anybody would act wild when somebody would tell you to get your hands up against the wall and you're on parole.

MR. KATZ: As a matter of fact, you are on parole until 1980?

A Yes.

Q And because you are on parole you started fighting the police?

A I didn't fight them, they didn't say I fought them in the statement.

MR. KATZ: What was the reason you were swinging your arms?

DEFENDANT CAREY: I didn't want them to put handcuffs on me.

MR. KATZ: Why were you swinging your arms?

DEFENDANT CAREY: I wasn't swinging my arms exactly.

MR. KATZ: Why didn't you want them to put handcuffs on you?

\*   \*   \*   \*   \*   \*

DEFENDANT CAREY: I was staying away, I wasn't swinging at them, but I didn't want them to put handcuffs on me. It would have been something different if I was trying to go up beside their heads and threw uppercuts and jabs, something like that.

MR. KATZ: Was Mr. Linthicum there?

DEFENDANT CAREY: Yes, he was there.

MR. KATZ: How many officers were there?

DEFENDANT CAREY: I think before the cruiser there was three or four.

MR. KATZ: You have quite a temper, don't you, Mr. Carey?

\*   \*   \*   \*   \*   \*

DEFENDANT CAREY: No, I don't have no temper, sir.

MR. KATZ: Why didn't you just stand there and tell the officers you hadn't done anything?

MR. MURPHY: Objection, Your Honor.

Tr., May 17, 1976, at 68–70.

Defense counsel timely objected to the final question, and thereupon moved for a mistrial on the grounds that the question impermissibly sought to have the jury draw the inference that an innocent person would not have remained silent at the time of arrest. The state's position is that the question was not substantively directed at guilt, but rather at impeachment of the immediately preceeding explanation offered by the defendant for his conduct at the time of the arrest.

■ The prosecution may not use, as substantive evidence, a defendant's postarrest silence in the exercise of "his Fifth Amendment privilege when he is under police custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 1625 n. 37, 16 L.Ed.2d 694 (1966). However, such silence may, under certain circumstances, be used as the basis of at-

tempted impeachment of a defendant by the prosecutor.

In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), Justice Powell cited to cases including *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), in which the Supreme Court "permitted use for impeachment purposes of post-arrest statements that were inadmissible as evidence of guilt because of an officer's failure to follow *Miranda's* dictates." *Doyle*, 426 U.S. at 617, 96 S.Ct. at 2244. In *Doyle*, Justice Powell held that:

> while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Id.* at 618, 96 S.Ct. at 2245 (footnote omitted). Subsequently, in *Jenkins v. Anderson*, 447 U.S. 231, 239, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980), Justice Powell, in the course of permitting the use of prearrest, pre-*Miranda* silence to impeach an exculpatory story offered for the first time at trial, wrote

> Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted.... Each jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative.

In *Fletcher v. Weir*, 455 U.S. 603, 606, 102 S.Ct. 1309, 1311, 71 L.Ed.2d 490 (1982), the Court noted in a *per curiam* opinion that it had characterized "Doyle as a case where the government had induced silence by implicitly assuring the defendant that his si-

lence would not be used against him," and held:

> In the absence of the sort of affirmative assurances embodied in the Miranda warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand. A State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony.

*Id.* at 607, 102 S.Ct. at 1312.

■ In this litigation, the question arises as to whether the purpose of the prosecutor's use of Carey's silence was to impeach trial testimony of Carey, or, as Carey contends, was elicited by the prosecutor to establish substantive evidence of guilt.[1] Both the trial court and the Court of Special Appeals of Maryland concluded that "the purpose for which [the question] was asked was not to impinge [on Carey's] Fifth Amendment right [to silence] but was to rebut his assertion that he ran solely because he was afraid about his parole." *State v. Carey*, No. 1190, slip op. at 3–4 (Md.Ct.Spec.App. Mar. 18, 1981) (per curiam), *cert. denied*, by the Md.Ct.App. No. 70, slip order (Md. May 27, 1981). The record sufficiently supports that conclusion. A review of the record indicates that, as the Maryland trial and appellate courts have determined, the question to which Carey objects was directed at Carey's explanation of his departure from the store. In *Fletcher*, the Supreme Court reversed the Sixth Circuit's holding that it was a violation of due process for the prosecution three times to question the defendant as to why he did not go to the police with an exculpatory story directed at the merits of the offense. *See Fletcher*, 658 F.2d 1126, 1129 n. 5 (1981), *rev'd*, 455 U.S. at 603, 102

---

**1.** The Court of Special Appeals of Maryland has permitted "cross-examination [of a defendant] concerning 'pre-arrest silence' with respect to exculpatory testimony offered by a defendant for the first time at the trial on the merits." *Robeson v. State*, 39 Md.App. 365, 369, 386 A.2d 795 (Md.Ct.Spec.App.1978), *aff'd*, 285 Md. 498, 403 A.2d 1221 (Md.1979), *cert. denied*, 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980).

S.Ct. at 1310. In the within litigation, the question was directed at Carey's exculpatory story as to why he left the store. During Carey's trial, the prosecutor asked the question only once, did not receive an answer from Carey, and did not again refer to Carey's silence. *Fletcher* teaches that such questioning of Carey was not impermissible in a setting in which no *Miranda* warnings were given.

## II. FAILURE TO GIVE TELFAIRE INSTRUCTION

The problems and dangers associated with the use of eyewitness identification testimony have long been recognized. *See, e.g., United States v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967) ("The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification."); *see generally* S. Saltzburg, American Criminal Procedure 513–79 (2d ed. 1984); Note, Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification, 29 Stan.L.Rev. 969 (1977). In the light of these dangers, the Fourth Circuit and the District of Columbia Circuit have called upon federal district courts to give the *Telfaire* instruction, pursuant to which the jury is cautioned to consider such testimony with great care.[2]

In the within litigation, the state trial court refused, upon request by Carey's trial counsel, to give the model *Telfaire* instruction, Tr., May 17, 1976, at 172, instead charging the jury that:

I further instruct you that the testimony of a single eyewitness to a crime, or a single witness to a crime, is sufficient to convict if you believe it beyond a reasonable doubt. I further instruct you in

respect to identification testimony, you may regard that with some caution and care, that is another way of expressing the beyond a reasonable doubt rule.

Tr., May 17, 1976, at 166. On post-conviction review, the Circuit Court for Baltimore City held that the wording of the instruction was within the discretion of the trial court, and was sufficient. *Carey v. State,* No. P.C.P.A. 3819, slip op. at 3–4 (Md. Cir.Ct. Sept. 19, 1983). Carey contends that the trial court's refusal to give the full model *Telfaire* instruction violated his right to due process, and that the trial court's instruction failed appropriately to focus the jury's attention upon the circumstances of the identification and the prior inconsistent identifications.

"A necessary predicate for the granting of federal habeas relief ... is a determination by the federal court that [petitioner's] custody violates the Constitution, laws, or treaties of the United States ...." *Rose v. Hodges,* 423 U.S. 19, 21, 96 S.Ct. 175, 177, 46 L.Ed.2d 162 (1975). *See also Layer v. Lyles,* 598 F.Supp. 95, 102 (D.Md.1984), *aff'd,* 767 F.2d 912 (4th Cir.1985). Those federal Circuits which have adopted the *Telfaire* instruction have done so not on the basis of due process, but rather in the exercise of supervisory power over the administration of criminal justice in the United States District Courts. *See, e.g., Holley,* 502 F.2d at 275 ("In *Telfaire* the District of Columbia Circuit adopted generally for judges within the district a model instruction.... We now do likewise as to the district judges in this circuit."). In no case has a federal court held that due process requires the *Telfaire* instruction. *See Jones v. Smith,* 599 F.Supp. 1292, 1304 (S.D.Ala.1984).

---

**2.** The District of Columbia Circuit in *United States v. Telfaire,* 469 F.2d 552, 558–59 (D.C.Cir. 1972), set forth a model instruction for use in cases involving eyewitness identification testimony. The Fourth Circuit has adopted the same model instruction for use in the district courts within this Circuit. *See United States v. Holley,* 502 F.2d 273, 277–78 (4th Cir.1974) (Craven, J.) (setting forth the *Telfaire* instruction as an appendix to the opinion). *See also United*

*States v. Greene,* 591 F.2d 471 (8th Cir.1979); *United States v. Revels,* 575 F.2d 74 (4th Cir. 1978); *United States v. Kavanagh,* 572 F.2d 9 (1st Cir.1978); *United States v. Butcher,* 557 F.2d 666 (9th Cir.1977); *United States v. O'Neal,* 496 F.2d 368 (6th Cir.1974); *United States v. Fernandez,* 456 F.2d 638 (2d Cir.1972); *United States v. Barber,* 442 F.2d 517 (3d Cir.1971), *cert. denied,* 404 U.S. 846, 92 S.Ct. 148, 30 L.Ed.2d 83 (1971).

■ Principles of federal criminal procedure developed under the supervisory power of the Courts of Appeals do not necessarily constitute constitutional requirements. As Justice Rehnquist wrote in *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), after reviewing the virtually unanimous hostility of the Circuits to the instruction that "[e]very witness is presumed to speak the truth," *id.* at 142, 94 S.Ct. at 398:

> The appellate courts were, in effect, exercising the so-called supervisory power of an appellate court to review proceedings of trial courts and to reverse judgments of such courts which the appellate court concludes were wrong.
>
> Within such a unitary jurisdictional framework the appellate court will, of course, require the trial court to conform to constitutional mandates, but it may likewise require it to follow procedures deemed desirable from the viewpoint of sound judicial practice although in nowise commanded by statute or by the Constitution. Thus even substantial unanimity among federal courts of appeals that the instruction in question ought not to be given in United States district courts within their respective jurisdictions is not, without more, authority for declaring that the giving of the instruction makes a resulting conviction invalid under the Fourteenth Amendment. Before a federal court may overturn a conviction resulting from a state trial in which this instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.

*Id.* at 146, 94 S.Ct. at 400.

More recently, in *Fletcher v. Weir*, 455 U.S. 603, 605, 102 S.Ct. 1309, 1311, 71 L.Ed.2d 490 (1982), the Court observed:

> The principles which evolved on the basis of decisional law dealing with appeals within the federal court system are not, of course, necessarily based on any constitutional principle. Where they are not, the States are free to follow or to disregard them so long as the state procedure as a whole remains consistent with due process of law.

■ Herein, in the face of Carey's due process challenge to the state trial court's refusal to give the *Telfaire* instruction, this federal court must

> accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artifical isolation, but must be viewed in the context of the overall charge.... While this does not mean that an instruction by itself may never rise to the level of constitutional error, ... it does recognize that a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction.

*Cupp*, 414 U.S. at 146–47, 94 S.Ct. at 400–01 (citations omitted).

Thus, seemingly, jury instructions will seldom form a basis for federal habeas relief. *Williams v. Lockhart*, 736 F.2d 1264, 1267 (8th Cir.1984). The specific problem raised by the within petition has recently been addressed by two courts. In *Williams*, the Eighth Circuit, which in its supervisory role, "strongly recommended" that the *Telfaire* instruction be given by the district courts within that circuit, *id.* at 1267 n. 2, held that the federal habeas petitioner had "not carried the heavy burden of establishing that any alleged error in the instructions rose to the level of constitutional significance." *Id.* at 1268. As in the within litigation, the state trial court in *Williams* had specifically refused to give a *Telfaire* instruction. *Id.* at 1266. Similarly, in *Jones v. Smith*, 599 F.Supp. 1292 (S.D.Ala.1984), Chief Judge Hand held: "Failure to give the requested [*Telfaire*]

instruction does not rise to the level of a constitutional violation. Even courts that are in favor of this instruction have not gone so far." *Id.* at 1304.

■ In the within litigation, the state trial judge's lengthy jury charge repeatedly emphasized the requirement that the prosecution prove its case "beyond a reasonable doubt and to a moral certainty." Tr., May 17, 1976, at 163; *see also id.* at 162–65; carefully stressed the need for the jury to assess the credibility of testimony, *see id.* at 165; and, as noted, *supra,* "further instruct[ed the jury that] in respect to identification testimony, you may regard that with some caution and care ...." *Id.* at 166. Under those circumstances and in the light of the case law reviewed *supra,* the trial court's refusal to give the *Telfaire* instruction requested by Carey's counsel has not "so infected the entire trial that the resulting conviction violates due process." *Cupp,* 414 U.S. at 147, 94 S.Ct. at 400.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

The framework for analysis of assistance of counsel claims is provided by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Briley v. Bass,* 750 F.2d 1238, 1247 (4th Cir.1984) (Wilkinson, J.). In *Strickland,* 466 U.S. at ——, 104 S.Ct. at 2066, 80 L.Ed.2d at 695, Justice O'Connor held that the defendant "must identify the acts or omissions of counsel" alleged to have constituted ineffective assistance of counsel and that as an initial matter, the defendant must demonstrate that he was so prejudiced by the ineffectiveness of counsel "that there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different." *Id.* at ——, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. That standard governs review both on direct appeal and in federal habeas proceedings. *Id.* at ——, 104 S.Ct. at 2070, 80 L.Ed.2d at 700.

The sole specific allegation of ineffective assistance of counsel raised by Carey in the within case arises from the prosecution's inquiry into the financial status of Carey at the time of the robbery. On direct examination, defense counsel asked Carey

Q When you came out of prison did you have any money?

A All together I had about $500—I had $450 in the bank, the Maryland National Bank.

Tr., May 17, 1976, at 47. On cross examination, the prosecution examined Carey as follows:

MR. KATZ: You said you had $450 in the bank the latter part of November, is that right?

DEFENDANT CAREY: I had saved it from some part of '70 on up.

MR. KATZ: Isn't it really correct that that $450 was the money that you took from Mr. Linthicum?

MR. MURPHY: Objection, Your Honor.

THE COURT: Overruled.

DEFENDANT CAREY: That was income tax money that had come back on time. I was working when I got arrested, I saved it for four years. All you got to do is to check the bank to find that out, you ain't got to take my word for it.

MR. KATZ: Did you tell your lawyer that before this trial started?

MR. MURPHY: Objection, Your Honor.

THE COURT: Overruled.

DEFENDANT CAREY: I told him that—

MR. MURPHY: Objection, Your Honor.

MR. KATZ: Yes or no?

THE COURT: Just a minute, the question is a legitimate one. You may answer the question and if you want to explain, by all means explain.

DEFENDANT CAREY: Yes, sir. I did about three days ago.

*Id.* at 78–79.

■ Carey contends that the prosecution's inquiry into his disclosure to his own attorney of his financial situation violated Carey's Sixth Amendment right to effec-

tive assistance of counsel, and that that alleged error was compounded by the trial court's comment that the question was "a legitimate one," Tr., May 17, 1976, at 79. Carey contends that the question permitted the jury to infer that Carey's counsel could take the stand to vouch for Carey's trial testimony.

■ "The essence of the Sixth Amendment right to effective assistance of counsel is, indeed, privacy of communication with counsel." *United States v. Brugman*, 655 F.2d 540, 546 (4th Cir.1981) (Merhige, J.).[3] However, as Justice White held in *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), albeit in a different context, even when the government has deliberately infringed upon the attorney-client relationship, a defendant is required to demonstrate "prejudice, or the substantial threat thereof," *id.* at 365, 101 S.Ct. at 668, before an indictment may be dismissed. *See also Layer v. Lyles*, 598 F.Supp. 95, 104 (D.Md.1984), *aff'd*, 767 F.2d 912 (4th Cir.1985), holding that "[t]he mere possibility of a violation of" petitioner's right to effective counsel did not "provide a basis for federal habeas corpus relief." Thus, Carey must show prejudice "sufficient to undermine confidence in the outcome" of the trial as a predicate to federal habeas corpus relief. *Strickland*, 466 U.S. at ——, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

The subject of petitioner's financial situation did not again arise during testimony, and was thereafter first referred to during closing argument by defense counsel:

Now, as to this business about the money in the bank, remember the State asked Daniel Carey, is it true that you had $450 that you said you had in the bank that actually came from the robbery, remember that? Well, it seems to me where there is a case where and liberty is a very delicate matter, the con-

vincing way of showing that to be an untruth would be to ask what bank he had the money in and get the bank record and show you the bank records. Now, he didn't do that, all he was asking him was a leading accusatory question, he didn't produce any documentary evidence to prove otherwise.

Tr., May 17, 1976, at 136.

During his rebuttal closing argument, the prosecutor discussed the financial issue as follows:

Ladies and gentlemen, ask yourselves what was the motive? I don't know what the man's motive was. I guess the most common motive in robbing someone is money. Did the defendant need money? You bet he did. He said his job was on strike at that time, he was out of work and he needed money. I don't know how much money he has in the bank, but that's for you to believe because I think when you consider as to how he changed his story as to how there was an identification and how he agreed that was totally made up, that is that he had a lot of money in the bank and was secure financially and didn't have to rob anybody.

*Id.* at 158.

■ The burden of showing that an alleged interference with the attorney-client relationship infringed upon a defendant's Sixth Amendment rights is a heavy one. In this litigation, there was a substantial amount of other evidence to support a verdict of guilty, most importantly the testimony of the victim, Mr. Linthicum. Furthermore, defense counsel was the first to raise the issue of Carey's financial situation both during testimony and closing arguments. Carey does not allege that his counsel's actions in doing so constituted ineffective assistance of counsel. In addition, this Court may not and will not "second-guess the outcome" of trial strategy

---

**3.** In Carey's post-conviction challenge in the Circuit Court for Baltimore City, that court concluded that the prosecutor's line of questioning did not violate the Sixth Amendment because Carey's voluntary testimony on direct examina-

tion waived his attorney-client privilege with regard to that issue. *State v. Carey*, P.C.P.A. No. 3819, slip op. at 3 (Md.Cir.Ct. Sept. 19, 1983). Herein, this court need not reach that issue.

decisions made by counsel. *Briley,* 750 F.2d at 1247. In this litigation, after holding an evidentiary hearing, the Circuit Court for Baltimore City on post-conviction review concluded that the prosecution's inquiry did not interfere with effective assistance of counsel. Such findings, while not binding upon this court, are to be accorded significant weight.

In the light of the record in this case, and the teachings of applicable case law, the prosecution's inquiry did not so prejudice Carey's rights as to permit him to obtain federal habeas corpus relief herein.

## IV. CAREY'S OTHER ALLEGATIONS OF ERROR

Carey's three additional allegations of error are: (1) he was not given *Miranda* warnings at the time of his arrest; (2) he was subjected to double jeopardy; (3) the trial court erred by allowing the state to impeach its own witness.

### A. *Miranda* Warnings

■ During post-conviction proceedings, Carey contended that he was not given *Miranda* warnings at the time of his arrest. However, while Carey was in police custody he was not interrogated and no statements by petitioner were introduced by the state at trial. Accordingly, *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), does not require that Carey should have been warned of his Miranda rights, but rather prohibits the state from introducing statements made during custodial interrogation unless such warnings had been provided. *Id.* at 444, 86 S.Ct. at 1612. In the absence of the admission of any such statements at trial, no *Miranda*-type error occurred herein.

### B. Double Jeopardy

■ Carey maintains that his conviction for, and sentencing to consecutive sentences for, both robbery with a deadly weapon and the use of a handgun in the commission of a crime of violence constituted double jeopardy. Under Maryland law, those two offenses are treated as separate and do not merge. *Couplin v. State,* 37 Md.App. 567, 579–82, 378 A.2d 197 (Md.Ct. Spec.App.1977), *cert. denied,* 281 Md. 735 (1978).

In *Missouri v. Hunter,* 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), the Supreme Court considered essentially the same contention of a federal habeas petitioner who had been convicted of robbery in the first degree with a deadly weapon and also of "armed criminal action." *Id.* at 361, 103 S.Ct. at 675. "[T]he Missouri Supreme Court has construed the two statutes at issue as defining the same crime." *Id.* at 368, 103 S.Ct. at 679. In *Hunter,* Chief Justice Burger held that "simply because two criminal statutes may be construed to proscribe the same conduct," *id.* at 368, 103 S.Ct. at 679, does not mean that cumulative punishments pursuant to those statutes violates the Double Jeopardy Clause if the legislature intended cumulative punishment under those statutes.

The Maryland courts have on numerous occasions affirmed that in adopting the handgun statute Maryland's legislature intended to authorize punishment for that offense separate from the underlying offense. *See, e.g., Whack v. State,* 288 Md. 137, 149, 416 A.2d 265 (1980), appeal dismissed, 450 U.S. 990, 101 S.Ct. 1688, 68 L.Ed.2d 189 (1981); *Couplin v. State, supra; Bremer v. State,* 18 Md.App. 291, 344–45, 307 A.2d 503 (1973), *cert. denied,* 269 Md. 755 (1973), *cert. denied,* 415 U.S. 930, 94 S.Ct. 1440, 39 L.Ed.2d 488 (1974). Accordingly, Carey's double jeopardy contention is without merit.

### C. State's Impeachment of its own Witness

■ Carey's final allegation is that the trial court erred in impeaching its own witness, Mr. Linthicum, with respect to prior inconsistent photographic identifications. Under federal law, the prosecution may impeach its own witnesses. Fed.R.Evid. 607. Whether or not Maryland law permits a party to impeach its own witness, *see General Motors Corp. v. Lahocki,* 286 Md. 714, 727, 410 A.2d 1039 (1980), is of no

consequence herein, since "a 'mere error of state law' is not a denial of due process," *Engle v. Isaac*, 456 U.S. 107, 121 n. 21, 102 S.Ct. 1558, 1568 n. 21, 71 L.Ed.2d 783 (1982) (O'Connor, J.). "[Q]uestions concerning the admissibility of evidence are matters of state law and are not reviewable in a federal habeas corpus proceeding unless the asserted error infringed a specific constitutional protection or was so prejudicial as to deny due process." *Wallace v. Lockhart*, 701 F.2d 719, 724 (8th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 340, 78 L.Ed.2d 308 (1984). *See also Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir.1983).

For the reasons set forth in this opinion, this court will file an Order denying the habeas corpus relief sought by Carey.